# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2008-CT-00484-SCT

*JOHNNY BROWN a/k/a JOHNNY RAY BROWN*
*a/k/a JOHNNY R. BROWN*

*v.*

*STATE OF MISSISSIPPI*

### ON WRIT OF CERTIORARI

DATE OF JUDGMENT:                    07/24/2006
TRIAL JUDGE:                         HON. WINSTON L. KIDD
COURT FROM WHICH APPEALED:           HINDS COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANT:             PRO SE
                                     DAVID NEIL McCARTY
ATTORNEY FOR APPELLEE:               OFFICE OF THE ATTORNEY GENERAL
                                     BY: JOHN R. HENRY, JR.
DISTRICT ATTORNEY:                   ROBERT SHULER SMITH
NATURE OF THE CASE:                  CRIMINAL - FELONY
DISPOSITION:                         REVERSED AND REMANDED - 07/22/2010
MOTION FOR REHEARING FILED:
MANDATE ISSUED:


**EN BANC.**

**CARLSON, PRESIDING JUSTICE, FOR THE COURT:**

¶1.    Johnny Brown was convicted of murder and sentenced as a habitual offender to life imprisonment in the custody of the Mississippi Department of Corrections. From the Hinds County Circuit Court judgment of conviction and sentence, Brown appealed, and we assigned the case to the Court of Appeals. After the Court of Appeals affirmed the trial-

court judgment, we granted Brown's petition for writ of certiorari. Finding error in the trial court's refusal to give an accidental-shooting instruction, we reverse and remand.

## FACTS AND PROCEEDINGS IN THE TRIAL COURT

¶2. The grand jury in the First Judicial District of Hinds County indicted Johnny "Shug" Brown for deliberate-design murder in the killing of Violar "Shun" Bracey. Brown also was put on notice in the indictment that he was being charged as a habitual offender under Mississippi Code Section 99-19-81. *See* Miss Code Ann. § 99-19-81 (Rev. 2007). The following history is taken from the facts and trial court proceedings as set out in the opinion of the Court of Appeals. ***Brown v. State***, 2009 WL 2999163 (Miss. Ct. App. Sept. 22, 2009); *reh'g denied*, Feb. 2, 2010.

¶3. The victim in this case, Bracey, was shot in the head on the night of December 11, 2004. The killing happened in a motel on Highway 80 in Jackson, Mississippi. Brown was identified on a security camera checking into the motel with Bracey, and Cathy Williams observed him leaving the motel after the shooting.[1] As Brown passed her, he told her, "Queen Bee, I think I done killed my wife." He then got into a white car and left. Williams told the employee at the front desk of the motel to check the room, at which point the employee found Bracey's dead body. An arrest warrant was issued, and three days later, police, acting on a tip from one of Brown's relatives, arrested him for Bracey's murder.

---

[1]Williams was also known as Tina McNair and Queen Bee.

¶4. Bracey's friend, Demeka Griffin, testified that Brown came to Griffin's house on the night of the incident to see Bracey. Griffin said that Bracey went outside a few times to talk to Brown. One time, she got angry and came back in the house after Brown threw liquor in her face. After that, Brown came back one last time, after which, Bracey left with him in her mother's car. Griffin testified that it seemed that Brown was trying to fight Bracey and get her to leave with him.

¶5. Williams testified that she saw Brown leave the motel on the night of the incident. She saw blood on his shirt, but she did not notice him carrying a gun. According to her testimony, all Brown told her was that he thought he had killed his wife. Williams did not go into the motel room, nor did she see anyone else go into the room. The motel employee who was working that night immediately checked the room after Williams informed him that there had been an incident. He called the police after he saw Bracey's body on the bed. He said that Brown and Bracey had checked into the motel approximately thirty minutes earlier. He said that Brown had signed the registration card as "Tom Fisher" and did not have any identification on him when he checked into the motel.

¶6. Officer Paul Ray Hobson with the Jackson Police Department was dispatched to the motel on the night of the incident. Detective Kent Daniels videotaped the scene. Officer James Chambers also responded to the scene and took pictures of the victim's mother's vehicle, which Brown took after the shooting, after it was towed to the crime-scene office. Katina Robbins, a forensic serologist with the Jackson Police Department, testified that

3

Bracey had sexual relations on the night she was killed. David Whitehead, a forensic scientist with the Mississippi State Crime Laboratory (MCL), testified concerning the gunshot residue found at the crime scene. In Whitehead's examination, he stated that Bracey's hands were properly bagged and sealed and that he had found no residue on her hands. He said that he would have expected to find residue if Bracey had been struggling with a gun when she was shot. Starks Hathcock, a forensic pathologist with the MCL specializing in firearms identification, testified that a .38 caliber projectile killed Bracey. He said the most popular .38 caliber pistol was a .38 special. If it was single-action, the gun would have needed to be cocked before firing, and if it was a double-action, the gun would have required more pressure to pull the trigger. Hathcock thought it was unlikely that either type of gun could be fired accidentally.

¶7. Detective Perry Tate with the Jackson Police Department responded to the crime scene following the shooting. He recovered the surveillance tape and the registration card from the motel employee. Police found Bracey's mother's car ditched on the side of the road. According to Detective Tate, the police went to Brown's house and his girlfriend's house, but they did not find him. Brown never called the police to inform them about the shooting. Three days later, police were contacted concerning Brown's whereabouts, and he was apprehended.

¶8. Keith Denson, an investigator with the Hinds County District Attorney's Office, testified concerning letters that Brown had sent to Bracey while Brown was incarcerated

before the shooting. The letters were written from January 1, 2004, through June 16, 2004. The letters reflected that Brown was upset with Bracey because she was seeing another man, known only as Ed. Brown also was upset because Bracey had Ed's name tattooed on her arm and because she had not sent Brown money while he was in jail. In one letter, Brown threatened to beat Bracey if she was seeing another man, and in three of the letters, he threatened to kill her.

¶9. The day following Bracey's death, Dr. Steven Hayne performed an autopsy. He noted only one injury to the victim–a contact gunshot wound on the right side of her head, slightly above and in front of her ear. Powder residue in the wound and the tearing of the skin around the wound indicated that the gun was in contact with the victim's head when it was fired. There was no trace of any blood spatter or gunpowder residue on Bracey's hands, indicating that her hands probably were covered when she was shot and that it was unlikely that she had fired the weapon. Also, it appeared as if her body had been rolled over after she was shot.

¶10. Brown took the stand and testified on his own behalf. He said that Bracey had always been upset with him ever since they had known each other. She was unhappy with the fact that he had slept with other women and had gotten another woman pregnant. Brown said that Bracey had cut him on the arm one time when she was upset with him for sleeping with another woman. Brown also told of a time, approximately three weeks before the incident, when Bracey had threatened him and sprayed him with mace. Brown said at the time of the

5

incident, he was seeing Bracey, but they were not in a serious relationship, because he was seeing other women, one of whom was expecting Brown's child. According to Brown, Bracey became suicidal after she found out that Brown had gotten another woman pregnant, and he testified that Bracey previously had tried to overdose on pills.

¶11. On the night of the incident, Brown testified that he went to Griffin's house to talk to Bracey, because she kept calling him. Brown's brother picked him up at the Dairy Bar, and they drove to Griffin's house. Brown's brother went inside while Bracey came outside to talk to Brown. When Brown's brother came back outside, he and Brown attempted to leave. As they were pulling out of the driveway, Bracey called again, so they went back, and Brown went up to the house. Afterward, Brown and Bracey got in Bracey's mother's car and left. He denied ever throwing liquor on her.

¶12. After leaving Griffin's house, according to Brown, he and Bracey drove to the motel. He checked in at the front desk and paid fourteen dollars for one hour. He denied signing a receipt at check-in or using a false name. Brown said that the only reason he was with her was for sex, and that he did not want to "be with her." He claimed that he had no reason to hurt her. He also denied possessing a weapon, and he said that he did not plan to hurt her. After checking in, they went to the room and had unprotected sex. Brown then said that he lay in bed with his back to Bracey to wait until his time in the room expired. Brown claimed that he did not realize that Bracey had a gun until she pushed him in the back of the head, and he saw the gun. He did not think that Bracey was serious until she said, "if I can't have

6

you[,] can't nobody have you." After that, Brown said he got on top of Bracey and made her drop the gun. According to his account, he then picked up the gun by the "part that turns," not by the handle. However, Bracey grabbed his arm, and then Brown "snatched back from her and the gun went off."

¶13. After the shooting, Brown said that he knew the police would take him to jail, so he ran because he wanted to see his son. Running out of the room, he saw Williams and told her to call an ambulance. Then he got in Bracey's mother's car and left. He said that he later had someone call the police so he could turn himself in for the shooting.

¶14. Kimberly Gilmore, who knew both Brown and Bracey, testified that Bracey had attempted to commit suicide a couple of times at least a year and a half before her death. According to Gilmore, Bracey had wanted to commit suicide because she was unhappy with a past boyfriend. Gilmore also testified that Bracey had a handgun, and that Gilmore had seen Bracey with a gun on a previous occasion.

¶15. Brown's brother, Robert Brown (Robert), corroborated Brown's testimony concerning the events that led up to Brown and Bracey leaving together from Griffin's house. Robert testified that Bracey had called Robert's cell phone because she could not get in touch with Brown. Robert later picked up Brown at the Dairy Bar. Bracey called back again once Robert had picked up Brown, and the two of them went to Griffin's house. Robert denied that they possessed any liquor at the time, and he said that Brown did not force Bracey to leave with him. Robert said that he and Brown had begun to leave, but they

7

went back to the house when Bracey called again. He also testified that he had seen Bracey with a revolver a couple weeks before the incident.

¶16. Lastly, the defense called Brown's mother, Sadie Willis. Bracey had lived with her for a period of time in 2004 when Brown was in jail. Willis testified that Brown and Bracey had a turbulent relationship, and that Bracey would get upset with Brown about other women. Willis said that Bracey once had attacked Brown and sprayed him with mace. Bracey had told her that she could not take it and that she would rather be dead than see Brown have a baby with another woman.

¶17. During the conference on jury instructions, the State argued that instruction D-1 was an improper statement of the law as it combined an instruction on accident and self-defense. The circuit court refused the instruction, stating: "In S-3[,] I've given an instruction which talked about self-defense, D-1 is refused." The jury returned a verdict of guilty of murder, and the circuit court sentenced Brown to life as a habitual offender. Brown presently appeals from that conviction. *Brown*, 2009 WL 2999163 at **1-4, ¶¶2-16.

## PROCEEDINGS IN THE COURT OF APPEALS

¶18. Before the Court of Appeals, Brown asserted that: (1) the trial court erred in refusing instruction number D-1 concerning the theory of accidental shooting; (2) the trial court erred in allowing Dr. Steven Hayne to testify on behalf of the State; (3) the evidence was legally insufficient to sustain a conviction; and (4) the verdict was contrary to the weight of the evidence. The Court of Appeals thoroughly addressed all four issues and found them to be

8

without merit, affirming the trial court's judgment of conviction and life sentence for murder. ***Brown***, 2009 WL 2999163 at *7, ¶34.

## DISCUSSION

¶19.     On April 22, 2010, we granted Brown's pro se petition for writ of certiorari. ***Brown v. State,*** 31 So. 3d 1217 (Miss. 2010). On May 3, 2010, attorney David Neil McCarty filed an entry of appearance and supplemental brief. *See* M.R.A.P. 17(h).  Based on our finding of reversible error due to the trial court's failure to give an accidental-shooting instruction, with one exception, we need not discuss the remaining issues raised before the Court of Appeals.   In other words, we are exercising our discretion under Mississippi Rule of Appellate Procedure 17(h) to limit the question on review. ***Brown v. State***, 986 So. 2d 270, 272 n.1 (Miss. 2008); ***Dora v. State***, 986 So. 2d 917, 921 n.8 (Miss. 2008).

¶20.     One of the issues before the Court of Appeals was whether the evidence against Brown was legally sufficient to support a conviction of murder.  If we were to decide this issue in Brown's favor, Brown would be entitled to have his judgment of conviction for murder reversed and to be forthwith discharged from the custody of the Mississippi Department of Corrections, where he is serving a term of life imprisonment without parole as a Section 99-19-81 habitual offender. *See* Miss. Code Ann. § 99-19-81 (Rev. 2007).  As always, when confronted with a challenge to the legal sufficiency of the evidence, we have a very specific standard of review.  This Court should consider all the evidence in the case before us, as well as all inferences which reasonably might be drawn from the evidence, and

then view this evidence in the light most favorable to the prosecution. In so doing, if we conclude that reasonable and fair-minded jurors, in the exercise of their impartial judgment, could reach different conclusions as to each element of the criminal offense for which the defendant is on trial, we are duty-bound to find that the evidence is legally sufficient to sustain the conviction and thus we must affirm on appeal. *Tate v. State*, 20 So. 3d 623, 643 (Miss. 2009) (citing *Christmas v. State*, 10 So. 3d 413, 422 (Miss. 2009)). *See also Bush v. State*, 895 So. 2d 836, 843 (Miss. 2005). The Court of Appeals very ably set out the evidence in the record which supported a finding that the evidence was legally sufficient to sustain the murder conviction, and we adopt that court's reasoning *in toto*. *Brown*, 2009 WL 2999163 at *6, ¶¶27-30.

¶21. We now turn to the critical issue before us in today's case, and we restate the issue for the sake of our discussion.

> **WHETHER THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY REFUSING TO GRANT AN ACCIDENTAL-SHOOTING INSTRUCTION.**

¶22. Brown testified on direct examination during his case-in-chief that, after he and Bracey had made love, he lay on the bed with his back to Bracey. Here is Brown's account of what happened next:

> She was talking to me, she was asking me was I going to be with her or what, you know, and I was like I wasn't really just hearing what she was saying so she pushed me in the back of the head. And when she pushed me in the back of the head I seen the gun. She had a gun and I started laughing 'cause I was looking at it like it was funny, you know. I'm like, know what I'm saying,

10

and she's like you going to be with me or you going to be with that "B" you know,' cause if I can't have you can't nobody have you.

. . .

I went to rubbing on her arm and I grabbed her arm and I come across her, you know, I come on top of her. I put her arm over her head. I made her drop the gun and when she dropped the gun I grabbed the gun but I didn't grab the handle of the gun. I had the part that turns or whatever. I was coming up with the gun, know what I'm saying and she grabbed my arm. When she grabbed my arm I snatched back from her and the gun went off.

Brown continued by stating that he had panicked and had become scared; therefore, he left so he could go see his children, because he knew he was going to jail. Brown also stated that he did not know what Bracey had in mind because "we done been in situations before" and "it ain't the first time . . . we done been in this type of situation." But Brown also stated that he cared for Bracey and did not mean to hurt her. Without question, based on Brown's later testimony on direct examination, he laid out a self-defense theory, that he had acted in self defense when Bracey had pulled the gun on him, but then in the ensuing struggle over the gun, the gun accidentally had discharged, killing Bracey. On cross-examination by the prosecutor, Brown, for the most part, stuck with his story as to how the shooting had occurred.

¶23.    At the time of the jury-instruction conference, by the time Brown submitted jury instruction D-1 to the trial judge for consideration, the trial judge had given jury instructions S-1 through S-5, inclusive, and S-7 and S-8. Jury instruction S-1 was the elements instruction concerning deliberate-design/depraved-heart murder. Jury instructions S-2 and S-3 informed the jury that it could consider the lesser crime of manslaughter. Jury

11

instruction S-4 was a limiting cautionary instruction concerning the introduction of evidence for impeachment purposes, as to a previous crime committed by Brown. Jury instruction S-5 was a self-defense instruction. Jury instruction S-7 was another form of a self-defense instruction, and jury instruction S-8 was the form-of-the-verdict instruction, giving the jury the options of finding Brown (1) guilty of murder; (2) guilty of manslaughter; or (3) not guilty.

¶24.    Then came the proffer of jury instruction D-1 for the trial court's consideration. Jury instruction D-1 stated:

> The Court instructs the jury that if you find from the evidence, or have a reasonable doubt therefrom that Johnny Brown while in the possession of the gun, a deadly weapon, and in the heat of passion during an altercation between Violar Bracey and Johnny Brown without any design or deliberation to cause the death of Violar Bracey, fired the fatal shot accidentally and though [sic] misfortune, upon sudden and sufficient provocation, then it is your sworn duty to find Johnny Brown not guilty.

¶25.    We set out here verbatim the jury-instruction conference as it related to jury instruction D-1:

> THE COURT: D-1, any objections?
>
> [PROSECUTOR]: Yes, Your Honor. I don't think D-1 is a proper statement of the law and it is somewhat redundant of the State's instruction concerning murder, manslaughter, and not guilty. I think it's confusing because it doesn't even give the jury an option of anything but not guilty. I think all that's covered in the State's instruction that says if the State has failed to prove A, B or C then you find the Defendant not guilty.
>
> [DEFENSE COUNSEL]: Your Honor, it's an instruction for an accidental shooting.

12

[PROSECUTOR]: I thought we were having a self-defense case.

[DEFENSE COUNSEL]: Your Honor, this instruction has been given before.

[PROSECUTOR]: It also comments on the actual evidence in the case. An instruction should not comment on the actual evidence in the case, not on one specific piece of evidence.

And Your Honor, this instruction tries to combine an accidental shooting and self-defense. In line four it says "fired the fatal shot accidentally and through misfortune" and then it goes to self-defense language, "upon sudden and sufficient provocation." It's combining a self-defense and accidental shooting and it's confusing.

THE COURT: In S-3 I've given an instruction which talks about self-defense.[2] D-1 is refused.

¶26. The trial judge did give two jury instructions concerning self-defense. Jury instruction S-5 stated:

> The Court instructs the Jury that to make an assault justifiable on the grounds of self-defense, the danger to the defendant must be either actual, present and urgent, or the defendant must have reasonable grounds to apprehend a design on the part of the victim to kill him or to do him some great bodily harm, and in addition to this he must have reasonable grounds to apprehend that there is imminent danger of such design being accomplished. It is for the jury to determine the reasonableness of the ground upon which the defendant acts.

Jury instruction S-7 stated:

> The Court instructs the Jury that a person may not use more force than reasonably appears necessary to save his life or protect himself from great bodily harm. The question of whether he was justified in using the weapon is for determination for the jury.

---

[2]Actually, jury instructions S-5 and S-7, and not jury instruction S-3, set out the self-defense theory.

The law tolerates no justification and accepts no excuse for an assault with a deadly weapon on the pleas of self defense except that the assault by the defendant on the victim was necessary or apparently so to protect the defendant's own life or his person from great bodily injury and there was immediate danger of such design being accomplished. The danger to life or of great personal injury must be or reasonably appears to be imminent and present at the time the defendant commits the assault with a deadly weapon. The term "apparent" as used in "apparent danger" means such overt, actual demonstration by conduct and acts of a design to take life or do some great personal injury as would make the assault apparently necessary to self preservation.

¶27.    When this Court is confronted with issues concerning the granting or denying of jury instructions by the trial court, we are required to read and consider the jury instructions as a whole in order to determine if error was committed. *Davis v. State*, 18 So. 3d 842, 847 (Miss. 2009) (citing *Milano v. State*, 790 So. 2d 179, 184 (Miss. 2001)). Likewise, jurors must be given appropriate instructions which fairly announce the law applicable to the case so as not to "create an injustice against the defendant." *Id.* Unquestionably, this Court has stated that, while a defendant must be assured of the opportunity to present his theory of the case to the jury via appropriately worded jury instructions, the trial court has the discretion to refuse an instruction which contains an incorrect statement of the law, which already is covered adequately in other instructions already given, or which is unsupported by the evidence. *Davis*, 18 So. 3d at 847 (citing *Phillipson v. State*, 943 So. 2d 670, 671 (Miss. 2006)). *See also Higgins v. State*, 725 So. 2d 220, 223 (Miss. 1998).

¶28.    We already have found that the evidence against Brown was legally sufficient to sustain the jury's verdict finding Brown guilty of the murder of Violar Bracey. Briefly

stated, the evidence in favor of the State indicated Bracey's hands were under a blanket at the time the fatal shot was fired while she was lying in bed. David Whitehead, a forensic scientist assigned to the trace-evidence section of the MCL in Jackson, testified that his tests of the gunshot-residue kit generated by the autopsy of Bracey revealed no gunshot residue on Bracey's hands, which would thus contradict Brown's theory of an accidental shooting while Brown and Bracey were struggling over the gun. Although the weapon involved in Bracey's killing was never recovered, there appears to be no question that the weapon was a .38 caliber pistol.

¶29. Hathcock, a MCL forensic scientist specializing in firearms identification, identified the projectile recovered from the scene as bearing a .38 caliber class, meaning that the projectile was fired from either a .38 caliber revolver or a .38 caliber semi-automatic weapon. In fact, Brown testified that, when he was trying to wrestle the gun from Bracey, he did not grab the handle of the gun, but instead, he grabbed "the part that turns or whatever." If Brown told the truth on the witness stand, this would indicate that the gun was a revolver. Hathcock informed the jury of the difference between a single-action trigger pull and a double-action trigger pull on a .38 caliber revolver. His testimony revealed that, while it could be relatively easy to have an accidental shooting with a .38 caliber revolver having a single-action trigger pull, the same could not be said about a .38 caliber revolver having a double-action trigger pull. In fact, Hathcock stated that it was "very highly unlikely" that a person could mistakenly fire a double-action revolver.

15

¶30. Dr. Hayne testified that the cause of Bracey's death was "a contact penetrating gunshot wound to the right side of the head," and that the manner of death was homicide.

¶31. Certainly, the testimony of Whitehead, Hathcock, and Hayne would not support Brown's theories of self-defense or accidental shooting in the killing of Bracey. However, this fact is of no moment when considering the instructions of law to be given to the jury by the trial judge.

¶32. Brown's theory of accidental shooting is grounded in law. Mississippi Code Section 97-3-17 states:

> The killing of any human being by the act, procurement, or omission of another shall be excusable:
> (a) When committed by accident and misfortune in doing any lawful act by lawful means, with usual and ordinary caution, and without any unlawful intent;
> (b) When committed by accident and misfortune, in the heat of passion, upon any sudden and sufficient provocation;
> (c) When committed upon any sudden combat, without undue advantage being taken, and without any dangerous weapon being used, and not done in a cruel or unusual manner.

Miss. Code Ann. § 97-3-17 (Rev. 2006). Brown was relying on subsection (b) of this statute, based on his testimony. Brown testified that, immediately prior to the shooting in the motel room, he was lying in the bed with his back to Bracey when he suddenly felt the barrel of a pistol pressing on the back of his head. In the heat of the moment, he acted in self-defense by attempting to wrestle the pistol from Bracey, but it accidentally discharged. Through jury instruction D-1, Brown was trying to have the jury instructed, consistent with Section 97-3-17(b), that if the jury found, among other things, that while he was in

16

possession of the gun, he, in the heat of passion during the altercation with Bracey, and without any deliberate design to cause Bracey's death, accidently fired the fatal shot through misfortune, upon sudden and sufficient provocation (the unexpected tussle with Bracey over the gun), then the jury was to find him not guilty.

¶33. Brown's testimony on this point, if believed by the jury, met all the statutory elements of an accidental shooting. "Whether or not a killing was the result of accident [or] misfortune is a question for the jury to decide after proper instruction." *Miller v. State*, 677 So. 2d 726, 730 (Miss. 1996) (citing *Day v. State*, 589 So. 2d 637, 643 (Miss. 1991)).

¶34. At the jury-instruction conference, the prosecutor opposed the proffered jury instruction D-1 for several reasons, including an argument that the instruction was confusing and improperly combined incompatible defenses of self-defense (related to an intentional shooting) and accidental shooting (related to an unintentional shooting). The trial judge's reasoning in denying jury instruction D-1 was that he already had given a self-defense instruction which had been submitted by the State. However, this Court has stated that "[a] criminal defendant has a right to assert alternative theories of defense, even inconsistent alternative theories." *Reddix v. State*, 731 So. 2d 591, 593 (Miss. 1999) (citing *Love v. State*, 441 So. 2d 1353, 1356 (Miss. 1983)). This Court also has stated that "[i]n homicide cases, the trial court should instruct the jury about a defendant's theories of defense, justification, or excuse that are supported by the evidence, no matter how meager or unlikely." *Evans v.*

*State*, 797 So. 2d 811, 815 (Miss. 2000) (quoting *Manuel v. State*, 667 So. 2d 590, 593 (Miss. 1995)).

¶35.    This Court found that an accidental-shooting instruction should have been given in

*Triplett v. State*:

> As noted, under the testimony adduced at trial, the jury would have been warranted in returning a verdict either of murder, manslaughter, or not guilty because of accident.
>
> While [the defendant's] trial testimony was weak, disputed, and also contradicted by his statement to the sheriff, he was entitled to have the jury instructed by an instruction specifically embracing the facts which he and Bray testified occurred which would have made this killing an excusable accident.  The defense was entitled to an instruction which told the jury that if [the defendant] had good reason to believe and did believe his life was in danger when he armed himself with the pistol handed to him by Gibson and then shot it into the air to frighten his attackers away, and the second shot was fired solely because Bray had unexpectedly grabbed him from behind and was tussling with him, and there was no intent on his part to fire the weapon the second shot, then he was not guilty of either murder or manslaughter.[3]

*Triplett v. State*, 666 So. 2d 1356, 1362 (Miss. 1995).

¶36.    Brown's "alternative theory" of defense, if not his main theory, that he accidentally

had shot Bracey "in the heat of passion" and "upon sudden and sufficient provocation," was

supported by the evidence to the extent that the trial judge should have given the jury an

accidental-shooting instruction. The ultimate responsibility of assuring that the jury is

properly instructed on all relevant issues of law in a case falls upon the trial judge.

Therefore, when the judge is confronted with what the judge perceives to be an improperly

---

[3]The defendant's version of the shooting was that, during this tussle between himself and Bray, the pistol accidentally had discharged, striking and killing a third person.

18

worded jury instruction attempting to set out a point of law on which the jury should be instructed, and which is not covered elsewhere in other jury instructions already given, the judge should take whatever remedial action necessary to present a properly worded instruction to the jury on that point of law. *Davis*, 18 So. 3d at 849 (citing *Duvall v. State*, 634 So. 2d 524, 526 (Miss. 1994)). *See also* *Kolberg v. State*, 829 So. 2d 29, 45 (Miss. 2002) (in which this Court stated "[t]here is no doubt that the trial court is ultimately responsible for rendering proper guidance to the jury via appropriately given jury instructions, even *sua sponte*.").

¶37. We urge our trial judges to remember that if "serious doubt exists as to whether an instruction should be included, the doubt should be resolved in favor of the accused." *Davis*, 18 So. 3d at 847 (citing *Stringfellow v. State*, 595 So. 2d 1320, 1322 (Miss. 1992)).

¶38. In sum, we conclude in today's case that there was a sufficient evidentiary basis for giving an accidental-shooting instruction, and that the trial court erred in refusing to instruct the jury on Brown's theory that he accidentally had shot Bracey. Likewise, we are constrained to find from the record before us that this error was not harmless. We no doubt may find an error to be harmless when the record of a particular case reveals that such error was so insignificant or unimportant that an automatic reversal of a conviction is not required. *Williams v. State*, 991 So. 2d 593, 599 (Miss. 2008). However, in today's case, we cannot find harmless error in the trial judge's failure to give an accidental-shooting instruction to

19

the jury. Certainly, a properly worded accidental-shooting jury instruction may have been the difference between a guilty verdict and a not-guilty verdict.

## CONCLUSION

¶39.   Because we find that the trial judge committed reversible error in failing to instruct the jury on Brown's theory of defense that the shooting of Bracey was committed by accident and misfortune, in the heat of passion, upon sudden and sufficient provocation, we reverse the judgment of the Court of Appeals, as well as the trial court's judgment of conviction for murder and life sentence as a habitual offender. This case is remanded to the Circuit Court of the First Judicial District of Hinds County for a new trial consistent with this opinion.

¶40.   **REVERSED AND REMANDED**.

**WALLER, C.J., GRAVES, P.J., DICKINSON, RANDOLPH, LAMAR, KITCHENS, CHANDLER AND PIERCE, JJ., CONCUR.**