IRVING, J.,
 

 for the Court:
 

 ¶1. Mary Lewis was convicted in the Hinds County Circuit Court of murder and sentenced to life in the custody of the Mississippi Department of Corrections. Aggrieved, she appeals and asserts (1) that the trial court erred in refusing to grant her request for a manslaughter instruction, (2) that the trial court erred in failing to grant her motion for a mistrial, and (3) that the trial court erred in allowing certain testimony.
 

 ¶ 2. We find that the facts support the granting of a manslaughter instruction; therefore, we reverse and remand this case to the circuit court for a new trial.
 

 
 *1005
 
 FACTS
 

 ¶ 3. On June 23, 2007, Lewis shot and killed her boyfriend, Arthur Patterson, at the intersection of Eminence Row and Sears Street in Jackson, Mississippi. Thereafter, she was arrested and charged with murder. On June 24, 2007, Lewis gave a statement to Jackson Police Department (JPD) Detectives Christopher Watkins and Kent Daniels. In the statement, Lewis set forth the chain of events that she contends happened before and after the shooting.
 

 ¶ 4. According to Lewis’s statement, shortly before midnight on June 22, 2007, she asked Patterson if she could borrow a Cadillac that the two of them shared. Lewis was baby-sitting at the time and told Patterson that she wanted to drive the baby around in order to get the baby to calm down. He agreed, and Lewis left with the baby. At some point thereafter, the Cadillac stopped, and Patterson came to assist with getting it running again. Patterson was successful and left thereafter. Lewis did not return home. Instead, she continued driving around. At some point she spotted Kurt, one of her relatives, who asked her to give one of his friends a ride. Before Kurt’s friend could get into Lewis’s vehicle, Patterson drove up and blocked in the Cadillac.
 
 [1]
 
 Patterson then approached the Cadillac, cursed at Lewis, ordered her out of the vehicle, and threw a beer bottle inside.
 
 [2]
 
 As Lewis attempted to pull off, a .22-caliber handgun “came from under the seat.” Lewis grabbed it and started shooting. Lewis stated that she thought she was “shooting down.” Shortly thereafter, she realized that she had shot Patterson. She then drove down the street but made a made a U-turn and returned to the scene to see if Patterson had a pulse. She asked Patterson’s passenger, Johnny Hawkins, to call 911, threw the gun in the grass, and fled to Roy Fleming’s house.
 
 [3]
 
 There, Lewis told Fleming that she thought that she had killed someone and asked him if she could park the Cadillac at his house.
 
 [4]
 

 ¶ 5. In addition to her written statement, Lewis also participated in a written question-and-answer session with the detectives, during which she stated that she had accidentally shot Patterson. Also, the detectives asked Lewis whether Patterson had assaulted her prior to the shooting; she responded that Patterson “had knocked the window out the car [sic] with the bottle and tried to grab [her] out the car [sic].”
 

 ¶ 6. Lewis stood trial in October 2007 for killing Patterson.
 
 [5]
 
 Hawkins witnessed the shooting and testified that Patterson, per his usual practice, came to pick him up at approximately 8:00 on the morning of the
 
 *1006
 
 shooting.
 
 [6]
 
 According to Hawkins, he and Patterson often rode around on Saturday mornings. However, on this particular Saturday, Hawkins recalled that Patterson told him that Patterson was looking for Lewis because she had taken his Cadillac. Hawkins testified that they rode around for about an hour before they saw the Cadillac on Eminence Row in Jackson. Hawkins also testified that Patterson pulled the vehicle he was driving in front of the Cadillac. He explained that another vehicle was parked behind the Cadillac, so after Patterson parked in front of the Cadillac, Lewis was blocked in. Hawkins stated that he remained in the car while Patterson walked up to the Cadillac and spoke with Lewis. Then, according to Hawkins, Patterson opened the door to the Cadillac and instructed Lewis to get out. Hawkins recalled that Lewis closed the door and began to roll the window up as Patterson attempted to reach in and remove the keys from the ignition. Hawkins testified that it was at that point that Lewis shot Patterson through the window, which was partly rolled up. Hawkins stated that Lewis drove off but returned within a few minutes. Hawkins testified that when she returned, Lewis went over to Patterson as he lay on the ground and cursed at him. Then, according to Hawkins, Lewis got in the Cadillac and drove away.
 

 ¶ 7. Robia Womack, a friend of Patterson’s, was in the area visiting friends when she witnessed the shooting. Womack testified that she saw Patterson as he drove down Sears Street and that she saw Lewis as she drove down Eminence Row. Wom-ack explained that Lewis was ahead of Patterson and that Patterson “took a left down Eminence Row and tided to block her off,” that Lewis “pulled up behind him, and [that] Kurt pulled up directly behind her.” Womack testified that, in an effort to get around Patterson’s vehicle, Lewis bumped into both Patterson’s and Kurt’s vehicles. Womack testified, as did Hawkins, that Patterson then approached the Cadillac and told Lewis that he wanted his vehicle back. Unlike Hawkins, Womack testified that Patterson struck Lewis once or twice with his fist. According to Wom-ack, at this point, Lewis pushed Patterson and managed to roll the window up. Womack stated that Lewis then shot Patterson through the window as he stood next to the Cadillac.
 

 ¶ 8. Bernice Henry testified that she witnessed a man and a woman “tussling” in a Cadillac at the intersection of Eminence Row and Sears Street on June 23, 2007, immediately prior to the man being shot. Henry stated that she did not see Patterson throw anything into the Cadillac before the shooting occurred.
 

 ¶ 9. Fleming testified that Lewis came to his house at approximately 10:00 on the morning of the shooting, hoping to leave the Cadillac at his house. He stated that he left, and when he returned home, the Cadillac was parked in his backyard. Fleming called the police the next day, and JPD Officer Craig Crowley recovered the Cadillac from Fleming’s residence.
 

 ¶ 10. The defense did not put on any witnesses, and following her trial, Lewis was convicted as charged. Additional facts, as necessary, will be related during our analysis and discussion of the issues.
 

 ANALYSIS AND DISCUSSION OF THE ISSUES
 

 1. Manslaughter Instruction
 

 ¶ 11. Lewis argues that the trial court erred in failing to grant her request for a manslaughter instruction. “The trial court enjoys considerable discretion re
 
 *1007
 
 garding the form and substance of jury instructions.”
 
 Higgins v. State,
 
 725 So.2d 220, 223 (¶ 15) (Miss.1998) (citing
 
 Splain v. Hines,
 
 609 So.2d 1234, 1239 (Miss.1992)). The circuit court denied Lewis’s manslaughter instruction because it found that there was insufficient evidence that Lewis had acted in the heat of passion and because the manslaughter theory was inconsistent with Lewis’s self-defense theory. We find that our supreme court’s recent decision in
 
 Brown v. State,
 
 39 So.3d 890 (Miss.2010) controls the outcome of this case.
 

 ¶ 12. Mississippi Code Annotated section 97-3-35 (Rev.2006) defines manslaughter as “[t]he killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense .... ”
 

 ¶ 13. In
 
 Broum,
 
 Johnny Brown was convicted of killing his wife, Violar Bracey; he claimed that he accidentally shot Bra-cey during a struggle after she had threatened him with a gun.
 
 Broum
 
 at 893-94 (¶ 12). The supreme court found that those facts were sufficient to establish “heat of passion”:
 

 Brown testified that, immediately prior to the shooting in the motel room, he was lying in the bed with his back to Bracey when he suddenly felt the barrel of a pistol pressing on the back of his head. In the heat of the moment, he acted in self-defense by attempting to wrestle the pistol from Bracey, but it accidently discharged. Through jury instruction D-l, Brown was trying to have the jury instructed, consistent with Section 97 — 3—17(b), that if the jury found, among other things, that while he was in possession of the gun, he,
 
 in the heat of passion during the altercation with Bracey,
 
 and without any deliberate design to cause Bracey’s death, accidently fired the fatal shot through misfortune, upon sudden and sufficient provocation (the unexpected tussle with Bracey over the gun), then the jury was to find him not guilty:
 

 Id.
 
 at 899 (¶ 32) (emphasis added).
 

 ¶ 14. Although
 
 Broum
 
 dealt with the propriety of an accidental-killing instruction, the same “heat-of-passion” standard would apply in our case. Womack testified that she witnessed Patterson strike Lewis in the face immediately prior to the shooting. In her statement to the police, Lewis stated that Patterson “had knocked the window out of the car with the bottle and tried to grab me out of the car.” These alleged acts are similar enough to Bracey’s acts in
 
 Broum
 
 to show heat of passion sufficient for a manslaughter instruction.
 

 ¶ 15. Furthermore, the
 
 Broum
 
 court also held that inconsistent theories of defense can be presented in jury instructions: “a criminal defendant has a right to assert alternative theories of defense, even inconsistent alternative theories.”
 
 Id.
 
 at 899 (¶34).- In
 
 Brown,
 
 Brown wanted to present a self-defense instruction and an accidental-shooting instruction.
 
 Id.
 
 These two theories are inconsistent, as self-defense is an intentional act and accidental-shooting is unintentional.
 
 Id.
 
 The
 
 Broum
 
 court found that the two theories could be presented regardless of their incompatibility.
 
 Id.
 
 Likewise, the self-defense and manslaughter instructions in the present case should have both been allowed, even though they are incompatible.
 

 ¶ 16. As our supreme court held in
 
 Broum,
 
 “[t]he ultimate responsibility of assuring that the jury is properly instructed on all relevant issues of law in a case falls upon the trial judge.”
 
 Id.
 
 at 900 (¶ 36). In this case, both a manslaughter instruction and a self-defense instruction should have been issued by the circuit court. Ac
 
 *1008
 
 cordingly, we reverse and remand for a new trial.
 

 2. Motion for Mistrial
 

 ¶ 17. Lewis moved for a mistrial because of an alleged discovery violation by the State. This issue is now moot because of our resolution of Lewis’s first issue.
 

 3. Testimony
 

 ¶ 18. In her final issue, Lewis contends that the trial court erred in allowing Colette Robinson to testify that Lewis had threatened to kill Patterson the Friday night before the shooting. Specifically, Lewis contends that because Robinson’s testimony was more prejudicial than probative, it violated Rule 403 of the Mississippi Rules of Evidence, which provides: “[although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.” It is well settled that “an appellate court reviewing a Rule 403 determination is not to engage anew in the Rule 403 balancing process. Rather, [an appellate court] must simply determine whether the trial court abused its discretion in weighing the factors and admitting or excluding the evidence.”
 
 Carter v. State,
 
 953 So.2d 224, 229 (¶ 11) (Miss.2007) (quoting
 
 Baldwin v. State,
 
 784 So.2d 148, 156 (¶ 27) (Miss.2001)).
 

 ¶ 19. Before Robinson took the stand, the trial judge held a conference outside of the presence of the jury to determine whether Robinson would be allowed to testify as to what Lewis had told her. After argument from both sides, the trial judge ruled that the probative value of Robinson’s testimony outweighed the prejudicial effect and allowed Robinson to testify. Thereafter, Robinson stated that she lived next door to Lewis and Patterson at the time of the shooting.
 
 [7]
 
 Further, she testified that Lewis came over to her house between 10:30 p.m. and 11:00 p.m. on the night before the shooting. According to Robinson, Lewis did not normally come over to talk to her. Robinson recalled that Lewis was upset and that Lewis told her that she “was going to kill [Patterson] that night.”
 

 ¶ 20. We find that the trial judge did not abuse his discretion in allowing Robinson to testify, as it was probative of Lewis’s intent to commit the crime. Accordingly, we find no merit to this issue.
 

 ¶ 21. THE JUDGMENT OF THE CIRCUIT COURT OF HINDS COUNTY IS REVERSED, AND THIS CASE IS REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED TO HINDS COUNTY.
 

 KING, C.J., LEE AND MYERS, P.JJ., GRIFFIS, BARNES, ISHEE, ROBERTS, CARLTON AND MAXWELL, JJ., CONCUR.
 

 [1]
 

 . It appears from the record, although it is not clear, that several hours had passed between the time that Patterson initially assisted Lewis with getting the car started and the time that he returned. Also, the record does not inform us as to what Lewis did in the interim. Also, the record does not contain Kurt’s full name.
 

 [2]
 

 . No beer bottle or broken pieces of a beer bottle were found inside the Cadillac or at the scene of the shooting.
 

 [3]
 

 . Lewis stated that Fleming is her aunt’s husband.
 

 [4]
 

 . Lewis does not specify what transpired between the point in time when Patterson came to assist her after the Cadillac had become inoperable and approximately 8:00 a.m. Saturday, when they met at the intersection of Eminence Row and Sears Street.
 

 [5]
 

 . Dr. Steven Hayne performed Patterson’s autopsy and testified that Patterson had died from a single gunshot wound to the abdomen, which caused massive internal bleeding.
 

 [6]
 

 . Hawkins testified that he is visually impaired, but not blind.
 

 [7]
 

 . Outside of the presence of the jury, the prosecutor informed the jury that Robinson lived with Hawkins at the time of the shooting.