# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-KA-00202-COA

**KENNARD R. NICHOLS A/K/A KENNARD RAYMOND NICHOLS A/K/A KEN NICHOLS A/K/A KEN R. NICHOLS**                                          APPELLANT

**v.**

**STATE OF MISSISSIPPI**                                          APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 01/12/2022 |
| TRIAL JUDGE: | HON. MARK SHELDON DUNCAN |
| COURT FROM WHICH APPEALED: | NEWTON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | JANE E. TUCKER |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: CASEY B. FARMER |
| DISTRICT ATTORNEY: | STEVEN SIMEON KILGORE |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | REVERSED AND REMANDED - 12/12/2023 |
| MOTION FOR REHEARING FILED: | |

**BEFORE BARNES, C.J., GREENLEE AND EMFINGER, JJ.**

**GREENLEE, J., FOR THE COURT:**

¶1.     Kennard Nichols was convicted by a Newton County Circuit Court jury for the first-degree murder of Donzell McDonald, and he was sentenced to life imprisonment in the custody of the Mississippi Department of Corrections.  On appeal, Nichols claims that the circuit court erred by denying his proposed "castle doctrine" jury instruction.  He also claims that the evidence was insufficient to support a murder conviction and that the jury's verdict was contrary to the overwhelming weight of the evidence.  After review, we find that the circuit court erred by failing to instruct the jury on the castle doctrine and therefore reverse Nichols' conviction and sentence and remand the case to the Newton County Circuit Court

for further proceedings.

## FACTS AND PROCEDURAL HISTORY

¶2.    Around 8:45 p.m. on October 2, 2019, Deputy Jonathan Ferguson with the Newton County Sheriff's Office was dispatched to Kennard Nichols' residence in Newton County. When he arrived, he found Nichols outside with a single-shot .410-caliber shotgun. He also observed Donzell McDonald, who was deceased, in the driver's seat of a truck that was still running in the driveway. Deputy Benjamin Kelly arrived shortly thereafter, and Nichols told the officers that he had shot McDonald. Nichols cooperated with law enforcement, and he was taken into custody.

¶3.    Both deputies testified that Nichols' residence was located approximately 70 to 100 yards from the road, and the truck was 20 to 30 yards from the residence with the rear positioned toward the residence. Additionally, both deputies indicated that the gates to the two entrances to Nichols' property were open when they arrived. Deputy Kelly did not recall seeing any "no trespassing" signs, and he testified that there was no evidence of forcible entry.

¶4.    During a search of the truck, law enforcement found 0.953 grams of cocaine and 6.634 grams of heroin in sixteen bags as well as a small pocket knife in the center console. They also recovered $2,020.34, a cell phone, and a closed pocket knife from McDonald's pocket. McDonald did not have anything in his hands, and no firearms were recovered from his person or the truck. Instead, at least two .45-caliber shell casings were found on the ground near the back of the truck. Deputy Kelly confirmed that it was possible to shoot .45-

2

caliber rounds from a .410-caliber shotgun like the one that was in Nichols' possession.

¶5.     According to Dr. David Arboe, the forensic pathologist who performed McDonald's autopsy, McDonald had a gunshot wound to the head and another to the neck. Dr. Arboe indicated that the bullets entered McDonald's body from "back to front." Additionally, Dr. Arboe observed stippling around the gunshot wound to McDonald's head, which may have indicated that McDonald was within three feet of the gun at the time of the shooting.[1]

¶6.     Later, law enforcement searched McDonald's cell phone. It appeared that McDonald called Nichols twice at 12:52 p.m. on the day of the shooting. Both calls lasted less than twenty seconds. Then, at 2:04 p.m., McDonald texted Nichols, "I'm at home cuzzo. Holla at me." Between 3:00 p.m. and 8:00 p.m., it appears that McDonald called Nichols twice, and Nichols called McDonald three times. The calls all lasted less than one minute. At 8:05 p.m.—approximately 40 minutes before law enforcement responded to the shooting—Nichols texted McDonald, "Please don't come to my house."

¶7.     Nichols and his wife primarily testified in Nichols' defense. Nichols' wife, Kimberly, testified that the first time she encountered McDonald was approximately one month before the shooting in September 2019 when he appeared at her place of employment. According to Kimberly, McDonald saw Nichols' truck outside and assumed Nichols was there. Kimberly called Nichols, and McDonald seemed upset because Nichols answered her phone call but had not answered his phone call earlier. Then, two weeks later, Kimberly received a phone call from McDonald. After telling her that he was calling to check on her and her

---

[1] Dr. Arboe testified that McDonald had Delta-9 THC in his blood.

3

children, he hung up. Finally, according to Kimberly, McDonald appeared at her place of employment again while Nichols was there. Kimberly described these encounters with McDonald as "frightening."

¶8. Nichols testified that he was prescribed medication after serving in the military. He explained that he became addicted to the medication and that he would purchase additional pills from McDonald—whom he had been raised to know as his cousin—when his prescription ran out. Nichols testified that he had "cleaned [his] life up" several months before the shooting and that he had stopped purchasing drugs from McDonald. Nevertheless, McDonald believed that Nichols owed him money and that Nichols had talked to the police. According to Nichols, McDonald told him that he would kill him if he had to go back to prison. Nichols testified that at some point McDonald said that Nichols' family was "involved too," and Nichols became scared for his family. Nichols refused to testify about McDonald possibly being involved in the deaths of other people. However, Nichols testified that he had seen McDonald hurt people and "knew [McDonald] would kill if he had to."

¶9. Nichols testified that on the day of the shooting, he was staining his house with at least one other person when he saw McDonald slowly drive by approximately three times. Nichols believed that McDonald did not try to enter his property at that time because there was at least one person besides Nichols at the house. Nichols testified that once the person/people helping him left for the evening, he closed the gate at the end of his driveway and put a chain and lock over it to make it appear locked. Nichols testified that his family would lock the gate when they returned home.

4

¶10.    Shortly thereafter, Nichols heard banging on his door.  When he looked outside, he saw McDonald's truck, and McDonald was standing "down by the steps."  According to Nichols, he always had a "no trespassing" sign posted on the gate, and McDonald must have pushed the gate open to enter the property.[2]  When Nichols turned around to retrieve his phone, McDonald went back to his truck.  Nichols watched McDonald drive toward the end of the driveway and believed that he was leaving.

¶11.    According to Nichols, he retrieved his gun before going outside to actually lock the gate.[3]  But when Nichols went outside, McDonald had backed the truck into the driveway and was approximately ten yards from his residence.  Nichols went to the driver's side of the truck and told McDonald to leave.  McDonald allegedly cussed at Nichols and said that he was going to kill him.  According to Nichols, McDonald was adamant that he (Nichols) had talked to the police and that he owed him money.  Nichols testified that he told McDonald to leave at least five times.

¶12.    At some point, McDonald indicated toward Nichols' gun and asked, "What you going to do with that piece of s***?"  Nichols responded that he did not want to do anything with it.  When Nichols told McDonald that his family was on the way home, McDonald allegedly said, "F*** yo family."  Nichols testified that he cocked his gun, and then McDonald said, "[Y]ou going to make me kill you, n****."  According to Nichols, McDonald moved as if

---

[2] Nichols testified that law enforcement must have opened the other gate on his property when they arrived at the scene, but both deputies disputed this claim.

[3] Nichols denied telling law enforcement that he retrieved his gun and then hid in the edge of the woods.  Nichols testified that if that information was written in the police report, then it was a lie.  It does not appear that the police report was offered into evidence at trial.

he was reaching for something, and Nichols fired the gun. Nichols testified, "I guess I missed him because he was still moving[, so] I reloaded and shot again."

¶13. Nichols testified that he was standing approximately five feet away from the truck when he shot McDonald. He testified that he was at enough of a distance where "if . . . [McDonald had] pulled his gun out . . . [he would] be aware to move or retaliate." He acknowledged, however, that McDonald did not have a gun or knife in his hand that night. But Nichols testified that he "couldn't tell none of that because [McDonald] was inside the truck." Nichols could not recall where McDonald reached, what hand McDonald used to reach, or what McDonald was reaching for. And he acknowledged that photographs showed McDonald sitting with his hands in his lap and his elbow propped on the center console.

¶14. When asked why he shot McDonald, Nichols testified that he was thinking about his family and that he was scared for them. He also testified, "I thought [McDonald] was fixing to shoot. He was reaching down[,]" and he had previously seen McDonald with a gun. Nichols testified that he thought McDonald was going to kill him and that he did not feel like he had a choice. Finally, Nichols acknowledged that when he called 911, he said that he could not remember McDonald's name.

¶15. During the jury instruction conference, the defense proposed a castle doctrine instruction (D-15). After hearing arguments from both sides, the circuit court held that there was no evidence of unlawful or forcible entry into Nichols' dwelling or the immediate premises and refused the proposed instruction. The jury was, however, instructed on self-defense.

6

¶16. During their deliberations, the jury requested a definition of the castle doctrine, and the circuit court responded, "You have received the law that applies to this case in the jury instructions. You should apply the evidence that you heard in the case to that law in reaching a verdict. Please continue your deliberations." Ultimately, the jury rejected Nichols' theory of self-defense, and Nichols was convicted of first-degree murder.

## DISCUSSION

### I. Whether the circuit court erred by refusing Nichols' proposed castle doctrine jury instruction.

¶17. Nichols claims that the circuit court erred by refusing to give his proposed castle doctrine jury instruction because it related to his theory of the case that he acted in self-defense.

¶18. "The standard of review with regard to a trial court's decision to grant or deny a jury instruction is abuse of discretion." *Thompson v. State*, 338 So. 3d 730, 738 (¶42) (Miss. Ct. App. 2022) (quoting *McCool v. State*, 328 So. 3d 173, 189 (¶76) (Miss. Ct. App. 2021)). "In its analysis, an appellate court considers all given jury instructions to determine whether, when read as a whole, they fairly announce the law of the case and create no injustice." *Id*. "If the instructions fairly state the law and do not prejudice the defendant, reversal is not warranted." *Id*. "In other words, if all instructions taken as a whole fairly, but not necessarily perfectly, announce the applicable rules of the law, no error results." *Id*.

¶19. Our supreme court has explained that "a defendant is entitled to have jury instructions given which present his theory of the case; however, this entitlement is limited in that the court may refuse an instruction [that] incorrectly states the law, is covered fairly elsewhere

7

in the instructions, or is without foundation in the evidence." *Newell v. State*, 49 So. 3d 66, 74 (¶20) (Miss. 2010) (quoting *Hearn v. State*, 3 So. 3d 722, 738 (¶45) (Miss. 2008)). And "[w]hen serious doubt exists as to whether an instruction should be included, the doubt should be resolved in favor of the accused." *Id.* (citing *Davis v. State*, 18 So. 3d 842, 847 (¶15) (Miss. 2009)). Lastly, "in homicide cases, the trial court should instruct the jury about a defendant's theories of defense, justification, or excuse that are supported by the evidence, no matter how meager or unlikely." *Pulliam v. State*, 321 So. 3d 1185, 1193-94 (¶27) (Miss. Ct. App. 2020) (quoting *Ambrose v. State*, 254 So. 3d 77, 146 (¶236) (Miss. 2018)).

¶20. Nichols' proposed castle doctrine jury instruction (D-15) provided:

> The [c]ourt instructs the jury that Ken Nichols is presumed to have reasonably feared imminent death or great bodily harm, or the commission of a felony upon him, or upon his family, or upon his dwelling, if Donzell McDonald had unlawfully and forcibly entered the immediate premises of Ken Nichols['] own dwelling, and if Ken Nichols knew or had reason to believe that the unlawful and forcible act had occurred.
>
> Therefore, unless the prosecution has convinced every member of the jury, beyond a reasonable doubt, every one of the following:
>
> 1) that Ken Nichols did not reasonably fear eminent [sic] death or great bodily harm or the commission of a felony on him or his dwelling, and also
>
> 2) that Donzell McDonald had not unlawfully and forcibly entered the immediate premises of Ken Nichols['] own dwelling, and also
>
> 3) that Ken Nichols did not know that Donzell McDonald had unlawfully and forcibly entered the premises immediately around Ken Nichols' dwelling,
>
> Then the State has failed to overcome this presumption, and you must presume that Ken Nichols acted justifiably in taking the life of Donzell McDonald, and you must find Ken Nichols "Not Guilty."

¶21. The castle doctrine "creates a presumption of fear and abridges a duty to retreat in

certain prescribed circumstances." *Newell*, 49 So. 3d at 74 (¶22). The castle doctrine, codified as Mississippi Code Annotated section 97-3-15(3) (Rev. 2020), states:

> A person who uses defensive force shall be presumed to have reasonably feared imminent death or great bodily harm, or the commission of a felony upon him or another or upon his dwelling, or against a vehicle which he was occupying, or against his business or place of employment or the immediate premises of such business or place of employment, if the person against whom the defensive force was used, was in the process of unlawfully and forcibly entering, or had unlawfully and forcibly entered, a dwelling, occupied vehicle, business, place of employment or the immediate premises thereof or if that person had unlawfully removed or was attempting to unlawfully remove another against the other person's will from that dwelling, occupied vehicle, business, place of employment or the immediate premises thereof and the person who used defensive force knew or had reason to believe that the forcible entry or unlawful and forcible act was occurring or had occurred. This presumption shall not apply if the person against whom defensive force was used has a right to be in or is a lawful resident or owner of the dwelling, vehicle, business, place of employment or the immediate premises thereof or is the lawful resident or owner of the dwelling, vehicle, business, place of employment or the immediate premises thereof or if the person who uses defensive force is engaged in unlawful activity or if the person is a law enforcement officer engaged in the performance of his official duties.

Miss. Code Ann. § 97-3-15(3).

¶22. This Court has held that "[t]o allege a factual basis under the Castle Doctrine, proof of . . . two prongs . . . must be presented." *Thomas v. State*, 75 So. 3d 1112, 1115 (¶13) (Miss. Ct. App. 2011). "First, . . . if the defendant is in a place where he had a right to be, is not the immediate provoker and aggressor, and is not engaged in unlawful activity, he has no duty to retreat before using defensive force . . . ." *Id.* "[S]econd, if the jury finds that any of the circumstances in [section 97-3-15(3)] are satisfied, the defendant who uses such defensive force is presumed to have reasonably feared imminent death or great bodily harm or the commission of a felony upon him." *Id.* at 1116 (¶13).

9

¶23.    The circuit court seemingly held that the second prong had not been met.  As noted, the circuit court held that there was no evidence of unlawful or forcible entry into Nichols' dwelling or the immediate premises and denied Nichols' proposed castle doctrine instruction. In his appellate brief, Nichols argues this case is analogous to *White v. State*, 127 So. 3d 170 (Miss. 2013).  In that case, Eboni White and Danielle Newsome lived across the street from one another in a trailer park.  *Id*. at 171 (¶2).  According to White, Newsome started a "campaign of harassment" against her after they had a "falling out."  *Id*. at 172 (¶2).  One morning, White heard banging on her door and Newsome outside threatening her.  *Id*. at (¶4). White stayed inside for approximately an hour and a half trying to avoid Newsome.  *Id*.  At some point, however, White exited her trailer, with a handgun in her backpack, and headed toward the driver's door of her vehicle.  *Id*. at (¶5).  Newsome came from across the highway and blocked White's access to her vehicle.  *Id*.  According to White, she saw something silver in Newsome's hand, which she thought was a weapon.  *Id*. at 172-73 (¶5).[4]  At that point, White "took her handgun from her backpack and shot Newsome several times."  *Id*. at 173 (¶5).  At trial, White testified "that she had witnessed Newsome's capacity for violence in other prior instances and felt she had to protect herself."  *Id*. at (¶8).  Ultimately, White was convicted of manslaughter.  *Id*. at (¶9).

¶24.    On appeal, White argued that she was entitled to a new trial because the jury was not instructed on the castle doctrine.  *Id*. at 176 (¶19).  In an 8-2 decision, this Court affirmed and held that because White's driveway was a "common" or public driveway that she shared with

---

[4] The silver object was possibly Newsome's cell phone as no weapons were found on her body.  *Id*. at 172-73 (¶¶5, 8) & n.1.

10

her roommates and the residents of the trailer next door, there was no evidence to support a trespass claim and, thus, no basis for a castle doctrine instruction. *Id*. at 176-77 (¶¶20, 22). However, our supreme court reversed the judgment and held that White was entitled to a castle doctrine instruction. *Id*. at 177 (¶23). The supreme court noted that the shooting occurred in the immediate vicinity of White's trailer and that, although White shared the driveway, she did not share it with Newsome. *Id*. Therefore, the supreme court held that there was a question as to whether Newsome was trespassing, and "[g]iven the evidence presented at trial, White was entitled to an adequate jury instruction setting forth Section 97-3-15(3)'s statutory presumption and its attending prerequisites as described by that section." *Id*. at (¶¶22-23).

¶25.    Relying on the supreme court's opinion in *White*, we find that there was sufficient evidence to support a castle doctrine instruction in this case. The record shows that the incident took place in the immediate premises of Nichols' home. Nichols testified that he closed the gate at the end of his driveway and positioned a lock and chain over the gate to make it appear locked. Nichols also testified that he always posted a "no trespassing" sign on the gate. According to Nichols, McDonald must have opened the gate. Then McDonald parked his truck in Nichols' driveway approximately ten yards from Nichols' house and proceeded to bang on Nichols' door. As in *White*, a question arises of whether McDonald was trespassing when he drove through the gate and went onto the property surrounding Nichols' residence. This question should have been presented to the jury.

¶26.    In its appellate brief, the State does not address whether there was a factual basis to

11

support a castle doctrine instruction. Instead, the State argues that the circuit court did not abuse its discretion by denying Nichols' proposed instruction because it was an incorrect statement of the law. It is true that we "may affirm . . . 'on grounds other than that which the trial court used.'" *Powell v. State*, 824 So. 2d 661, 667 (¶26) (Miss. Ct. App. 2002) (quoting *Kirksey v. Dye*, 564 So. 2d 1333, 1336 (Miss. 1990)). However, it is well established that "[w]here the instructions are in improper form and are the only ones embodying a legally correct theory of the defendant's defense, it is the duty of the trial court to see that the instructions are placed in proper form for submission to the jury." *Manuel v. State*, 667 So. 2d 590, 593 (Miss. 1995); *accord Brown v. State*, 39 So. 3d 890, 899-90 (Miss. 2010).

¶27. During appellate oral argument, the State suggested that the circuit court did not have a duty to correct Nichols' proposed castle doctrine instruction because the jury received other instructions on his theory of self-defense. However, as discussed, the castle doctrine would have afforded Nichols a presumption of reasonable fear if McDonald "was in the process of unlawfully and forcibly entering, or had unlawfully and forcibly entered [Nichols'] dwelling . . . or the immediate premises thereof." Miss. Code Ann. § 97-3-15(3). This presumption was not addressed by any of the other instructions that were given to the jury for consideration. Although jury instruction S-9 addressed the presumption of reasonable fear, the State withdrew the instruction.

¶28. After review, we conclude that there was a sufficient evidentiary basis for giving a castle doctrine instruction and that the circuit court had a duty to correct (or instruct the parties to correct) the proposed instruction. Furthermore, this error was not harmless. "We

no doubt may find an error to be harmless when the record of a particular case reveals that such error was so insignificant or unimportant that an automatic reversal of a conviction is not required." *Brown*, 39 So. 3d at 900 (¶38) (citing *Williams v. State*, 991 So. 2d 593, 599 (Miss. 2008)). However, in the instant case, we cannot find harmless error in the judge's failure to give a castle doctrine instruction. A properly worded instruction may have been the difference between a guilty verdict and a not-guilty verdict.

II.     **Whether the evidence was insufficient for a conviction, or whether the jury's verdict was against the overwhelming weight of the evidence.**

¶29.    Nichols claims that the evidence was insufficient and that the jury's verdict was against the overwhelming weight of the evidence.

¶30.    "A criminal defendant has several procedural vehicles available to him for challenging the sufficiency of the evidence." *McNair v. State*, 346 So. 3d 512, 516-17 (¶18) (Miss. Ct. App. 2022) (quoting *Russell v. State*, 296 So. 3d 217, 223 (¶16) (Miss. Ct. App. 2020)). "A challenge to the sufficiency of the evidence 'can be raised in a motion for directed verdict made at the end of the case for the prosecution, a request for a peremptory instruction at the end of all of the evidence or the motion for a directed verdict at that point, or finally, a motion for judgment of acquittal notwithstanding the verdict.'" *Id*. at 517 (¶18). "When the sufficiency of the evidence is challenged on appeal, we review the circuit court's ruling on the last occasion when the sufficiency of the evidence was challenged before the trial court." *Id*.

¶31.    "When reviewing a challenge to the sufficiency of the evidence, 'the relevant question

13

is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* at 517 (¶19) (quoting *Russell*, 296 So. 3d at 223 (¶17)). "The issue on appeal is not whether the reviewing court would have found the defendant guilty; rather, the conviction must be affirmed if there was sufficient evidence for 'any rational trier of fact' to have rendered a guilty verdict." *Id*.

¶32. "In reviewing the denial of a motion for a new trial based on an objection to the weight of the evidence, this Court will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *McNair*, 346 So. 3d at 518 (¶28) (quoting *Grace v. State*, 281 So. 3d 986, 992 (¶18) (Miss. Ct. App. 2019)). "The evidence is [viewed] in the light most favorable to the verdict." *Id*. "We do not reweigh evidence. We do not assess the witnesses' credibility. And we do not resolve conflicts between evidence. Those decisions belong solely to the jury." *Id.* (quoting *Thompson v. State*, 302 So. 3d 1230, 1234 (¶11) (Miss. Ct. App. 2020)).

¶33. Nichols' challenge to the sufficiency and weight of the evidence is based on his contention that the jury would have acquitted him had the jury been instructed on the castle doctrine. He does not argue that the State's evidence was insufficient to show that he killed McDonald with deliberate design. While we find that the evidence was legally sufficient to support Nichols' conviction, we also find that Nichols was entitled to a jury instruction on the castle doctrine. Therefore, the appropriate remedy is to reverse the judgment of the

14

circuit court and remand the case for a new trial.

¶34.    **REVERSED AND REMANDED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., WESTBROOKS, McDONALD, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.**