446 So.2d 580 (1984)
Vernon Lee SCOTT
v.
STATE of Mississippi.
No. 54131.
Supreme Court of Mississippi.
February 22, 1984.
*581 William A. Brown, Joel P. Walker, Walker, Brown & Brown, Hernando, for appellant.
Bill Allain, Atty. Gen. by Frankie Walton White, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before ROY NOBLE LEE, P.J., and HAWKINS and DAN M. LEE, JJ.
DAN M. LEE, Justice, for the Court:
This is an appeal from the Circuit Court of DeSoto County wherein the appellant, Vernon Lee Scott, was found guilty of murder. Scott was indicted in the February, 1981 term of the DeSoto County Grand Jury. The indictment charged him with the *582 December 6, 1980 murder of W.C. "Dub" Turner. Upon the jury's verdict finding Scott guilty of murder the court sentenced him to life imprisonment in the custody of the Mississippi Department of Corrections. From that conviction and sentence he brings this appeal. We reverse.
On December 6, 1980, W.C. "Dub" Turner died as a result of being shot twice by a .22 caliber pistol. Turner was killed during a scuffle between himself and Vernon Lee Scott. The events leading up to the shooting are not in dispute but, as we often find, there is more than one version of the shooting itself and the events immediately thereafter.
Scott testified that on the fateful evening he was in the apartment of his girlfriend, Viola Person. Just as they were about to eat dinner Dub Turner came to Ms. Person's door to ask Scott to help him fix his stereo. Scott told Turner that he would be over after dinner. Moments later, Scott changed his mind and he and Ms. Person walked across the hallway to the Turners' apartment. Scott stated that because he had repeatedly been asked to show Turner how to operate his stereo that he told Turner that he ought to get another one. In response, Turner stated that it was his money and that he would keep his tape player. Scott then told him that if he had so much money then he should pay him (Scott) for helping to fix Turner's car. Turner replied that he would pay Scott with a .22. Scott testified that at the time Turner said this he was lying on the couch. Turner then pulled a gun from under the pillow on which he was reclining and fired it in Scott's direction. This is the point at which the testimony becomes conflicting.
Scott testified that as he and Turner were scuffling, Turner called for his wife, Willie Mae Turner, to "Come here and get this Nigger off of me." Scott stated that the weapon went off once while Willie Mae was hitting him with a stick at which time she quit hitting him. Scott also testified that the gun discharged twice more after she stopped hitting him. He was certain that all in all Turner had fired the gun four times. After the last shot, Scott claims that he wrested the gun away from Turner, took it to an outside door where he pointed it at the ground and squeezed the trigger a couple of times. Neither time did the gun go off. Scott testified that he did this to assure that there were no more live rounds in the weapon. As Scott started to leave Turner said "Don't take my gun." Scott replied, "Well, I don't want your gun, Dub." With that Scott threw the gun on the floor of the Turner apartment.
Cagon Simmons, another apartment resident, had been summoned by Ms. Person during the fracus. As Scott left he asked Simmons if anyone was hurt in the Turner apartment to which Simmons replied, "No." Scott stated that he went to Ms. Person's apartment for approximately fifteen to twenty minutes and was determined to have a talk with Turner the following day. Scott was certain that Turner's behavior was the result of drunkenness. Viola Person's testimony corroborated Scott's story.
Cagon Simmons was the primary witness for the state and as such he told a different story. Simmons testified that he had been summoned by Viola Person and followed her down to the Turners' apartment where he found Scott and Turner fighting. Simmons stated that when he walked into the apartment Willie Mae Turner was whipping Scott on the back with a chair. As the two were wrestling the gun went off twice and the second time it fired Willie Mae Turner sat down. Simmons stated that Scott then took the gun away from Turner, stepped eight to ten feet away, turned and shot Turner. Simmons testified that after this Scott told him to leave the apartment and go home. Simmons claimed he left the apartment just before Scott. Simmons denied that anyone asked him if the Turners were okay.
Following all of the evidence the jury deliberated and found Scott guilty of murder. The trial judge later sentenced him to a life sentence in the custody of the Mississippi Department of Corrections.
In reviewing Scott's conviction, we turn first to the instructions given to the jury. *583 Of great concern to this Court is Instruction S-1 which reads:
The Court instructs the jury that the killing of a human being is an excusable homicide if, the Defendant acts (sic) which caused the death of W.C. Turner, was a result of sudden combat, without taking undue advantage and without the use of a dangerous weapon and not in a cruel and unusual manner.
If you find from the evidence beyond a reasonable doubt that W.C. Turner's death was caused by being shot with a gun wielded by the Defendant, Vernon Lee Scott, and that it was not in necessary self-defense, and it was not in sudden combat, and he the said Vernon Lee Scott did take undue advantage, then you shall find the Defendant guilty as charged by writing your verdict on a separate sheet of paper. (Emphasis added.)
Scott argues that the instruction is faulty because it fails to mention all of the circumstances in which a killing is legally excusable. Section 97-3-17 of the Mississippi Code Annotated (1972) lists those conditions under which a killing is excusable:
The killing of any human being by the act, procurement, or omission of another shall be excusable:
(a) When committed by accident and misfortune, in lawfully correcting a child or servant, or in doing any other lawful act by lawful means, with usual and ordinary caution, and without any unlawful intent;
(b) When committed by accident and misfortune, in the heat of passion, upon any sudden and sufficient provocation;
(c) when committed upon any sudden combat, without undue advantage being taken, and without any dangerous weapon being used, and not done in a cruel or unusual manner.
As is obvious from the reading of Instruction S-1 the sole excuse listed in that instruction is subsection (c) of § 97-3-17. The instruction completely fails to mention accident, misfortune, the heat of passion, or any sudden and sufficient provocation. Although Instruction D-4 did mention those factors, it does not remedy the defect in S-1. This is so because S-1 is conclusive in nature and therefore in hopeless conflict with an instruction like D-4 which lists other occasions in which a homicide may be excusable. When a jury is given instructions which are in hopeless conflict this Court is compelled to reverse because it cannot be said that the jury verdict was founded on correct principles of law. Pittman v. State, 297 So.2d 888 (Miss. 1974).
This Court is also troubled by the granting of Instruction S-8 which reads:
The Court instructs the Jury that in order to justify a homicide on the plea of self-defense, there must be something shown in the conduct of the deceased indicating a present intention to kill or do some great personal injury to the slayer and imminent danger of such intention being accomplished; mere fears or beliefs are insufficient. The danger must be such as to lead a person reasonably to believe that the killing was necessary to prevent the deceased from killing him or doing him some great bodily harm.
A party may have an apprehension that his life is in danger and believe the grounds of his apprehension just and reasonable, and yet he acts at his peril. He is not the final judge; the Jury may determine the reasonableness of the ground upon which he acted. (Emphasis Added)
Recently, in Robinson v. State, 434 So.2d 206 (Miss. 1983), this Court condemned an instruction similar to S-8. This is so because the instruction is self contradictory and confusing. The troublesome part is the first sentence of the final paragraph. If a party has "an apprehension that his life is in danger" and believes "the grounds of his apprehension just and reasonable" a homicide committed by that party is in self-defense. These are the grounds upon which a claim of self-defense must be predicated. Shinall v. State, 199 So.2d 251 (Miss. 1967); Bond v. State, 249 Miss. 352, *584 162 So.2d 510 (1964). A party acting upon this principle does not "act at his peril." Of course, it is for the jury to determine the reasonableness of the ground upon which the defendant acts but if the defendant's apprehension is reasonable, there is no peril.
Our decision today should be a clear indication that instructions such as S-8 are condemned and should not be used upon a retrial of this matter.
This Court is also troubled by the granting of Instruction S-7 which reads:
The Court instructs the Jury that every willful killing of a human being, not in necessary self-defense and not justified by law is either Manslaughter or Murder is done deliberately with malice aforethought, Manslaughter is done without malice or deliberation, but in the heat of passion, by use of a deadly weapon, without authority of law and not in necessary self-defense.
If you, the Jury, find from the evidence in this case, beyond a reasonable doubt, that W.C. Turner died as a result of his having been shot by the Defendant, VERNON LEE SCOTT, through the use of a deadly weapon, while VERNON LEE SCOTT, was angry and in the heat of passion, and that the shooting was not in necessary self-defense, then you shall find the Defendant guilty of manslaughter.
Because S-7 is somewhat confusing in that it may be read to mean that every killing is either manslaughter or murder we trust that it will not be repeated at retrial.
A century ago in Ingram v. State, 62 Miss. 142 (1884) this Court cautioned district attorneys against submitting too many instructions. We now repeat that warning. An over zealous attempt to define the law often results in merely misleading and confusing the jury. As we stated in Ingram,
If fewer instructions were given and greater care was observed in framing them, it would be most favorable to the interest of the state in the administration of the criminal laws. In many cases it would be wise to give no instructions at all for the state, and in none is it prudent to give too many. By this course convictions would be just as numerous and reversals would be rare.
62 Miss., at 145.
During the cross-examination of Scott's girlfriend, Viola Person, an incident occurred which must not be repeated at retrial. That incident, was an attempt by the district attorney to impeach Ms. Person's testimony by use of her grand jury testimony. During the cross-examination of Ms. Person, the district attorney asked her several times if she had not told the grand jury a different story. At least four times he gave his version of what he asserted that she had told the grand jury. Also, each time she denied having told a different story to the grand jury.
This question appears not to have arisen in this jurisdiction as of yet. Federal courts permit the introduction of grand jury testimony to impeach a witness where there is a transcript of that proceeding and where the witness is available for examination. Young v. United States, 406 F.2d 960, 132 U.S.App.D.C. 142 (1968). Such is not the case here. In the instant case the district attorney's attempts to impeach Viola Person amounted to nothing more than hearsay testimony on his part. There was never any transcript of the grand jury proceedings introduced at trial to establish that Ms. Person had made conflicting statements, indeed, no such transcript existed in this record. The district attorney could have simply made any incriminating statement he chose and repeatedly asked Ms. Person had she not made that statement before the grand jury. Without a transcript of the proceedings the only rebuttal to the district attorney's line of questioning becomes the witness' denial. This carries with it two inherent prejudices. First, the jury is far more likely to believe that the witness did indeed make those statements before the grand jury simply because the district attorney is insistent that she did. *585 The district attorney then becomes a witness against the defendant. Second, the use of this tactic effectively denies the defendant of the right to counsel as his attorney is barred from attending the grand jury proceedings whereas the district attorney is not. Therefore, the defense attorney has no way of preparing to examine a witness or to rebut the district attorney's accusation. Because due process has been defined as "fundamental fairness" and this proceeding is fundamentally unfair we hold that allowing a district attorney to accuse a witness of making conflicting statements before a grand jury without offering any proof to that effect amounts to a denial of due process.
Another incident occurred in relation to Ms. Person's testimony which should not be repeated during retrial. In rebuttal, the state put on Officer Bethune in an attempt to impeach Ms. Person's testimony. During Officer Bethune's rebuttal testimony he began reading from a written statement. He testified that these were notes that he had made as he talked with Viola Person but that he had never shown them to her. Over Scott's objection the trial court admitted Officer Bethune's notes into evidence. This was error for two reasons.
First, in Cutshall v. State, 203 Miss. 553, 35 So.2d 318 (1948), this Court set forth the predicate necessary for a witness to use a writing to refresh his recollection or as past recollection recorded. It must appear that the witness has no present memory of the event. If the witness can refresh his memory by simply reviewing his writing, then he is to testify from his own memory. If, however, a review of the writing does not refresh the witness' memory and he testified to making the record at the time of the transaction and that he would not have made it if it had not been true he will be permitted to testify directly from a memorandum. Clearly that predicate was not laid in this case. Officer Bethune never acknowledged having faulty memory of the events. He simply began a spontaneous reading from his version of Ms. Person's statement to him.
Also, allowing the jury to have Officer Bethune's notes while it deliberated amounts to an improper bolstering of his testimony. We trust that this error will not occur upon retrial.
Therefore, based on all of the foregoing, we hereby reverse the conviction and sentence of Vernon Lee Scott and remand this cause to the Circuit Court of DeSoto County for proceedings consistent with this opinion.
REVERSED AND REMANDED.
PATTERSON, C.J., WALKER and ROY NOBLE LEE, P.JJ., and BOWLING, HAWKINS, PRATHER, ROBERTSON and SULLIVAN, JJ., concur.