# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2024-KA-01301-SCT

*BILLY RAY GIBSON a/k/a BILLY GIBSON*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 10/08/2024 |
| TRIAL JUDGE: | HON. JAMES D. BELL |
| TRIAL COURT ATTORNEYS: | STEVEN DARRYLL USRY |
| | JODY EDWARD OWENS, II |
| | JOSEPH SCOTT HEMLEBEN |
| | THOMAS P. WELCH, JR. |
| | SHARON ALGENA SPENCER |
| | DAVID FITZGERALD LINZEY |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: DANIELLE LOVE BURKS |
| DISTRICT ATTORNEY: | JODY EDWARD OWENS, II |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | REVERSED AND REMANDED - 03/19/2026 |
| MOTION FOR REHEARING FILED: | |

**BEFORE KING, P.J., ISHEE AND SULLIVAN, JJ.**

**SULLIVAN, JUSTICE, FOR THE COURT:**

¶1. Billy Ray Gibson was indicted in the Hinds County Circuit Court for first-degree murder of his girlfriend, Darcie Rich. A jury found Gibson guilty of second-degree murder. Gibson appeals raising numerous issues. We find that only one issue has merit: Gibson's claim that he was denied a jury instruction for excusable homicide. Finding that the trial testimony supports such an instruction, we reverse and remand for a new trial.

## FACTS

¶2. Around noon on Christmas Eve 2019, officers from the Jackson Police Department were called to Gibson and Rich's residence concerning an assault on Rich. Gibson told the police that he and Rich had been involved in a physical altercation with two of Rich's former coworkers outside the residence.

¶3. Officers found Rich inside the residence lying unconscious. She was taken to the University of Mississippi Medical Center (UMMC), where she died from her injuries six days later, on December 30. The cause of death was "multiple blunt-force trauma [sic]" to Rich's head resulting in subdural and intracranial bleeding.

¶4. Bruises and abrasions were observed and photographed on both Gibson's and Rich's hands. Rich had bruising to her face and abrasions on both arms. Gibson's right eye was swollen.

¶5. Inside the home, Investigator Andrew Harris observed and photographed a "red substance that appeared to be blood on the kitchen floor," the bathroom, and near a broken metal broomstick in the kitchen. Investigator Harris testified that it appeared that someone had tried to clean the area where apparent blood was observed.

¶6. Officers obtained video footage from a neighbor's surveillance camera.[1] According to Detective Jarron Carter, the video showed no outside altercation as described by Gibson. It showed Rich arrive home and enter the residence; Gibson arrived shortly thereafter.

---

[1] According to the State, the video was not submitted at trial because it had been recorded over by the time investigators later returned to the neighbor's house to retrieve it.

2

Moments later, the video showed Gibson come out of the residence and put what was "believed to be a rug" in the back of a truck; video then showed him returning inside. Gibson's uncle Jessie Stringer then drove up to the residence and retrieved Gibson's six-year-old son Ben,[2] whom Gibson brought outside to Stringer.

¶7. Gibson initially was charged with assault. After investigators observed and photographed Rich's injuries at the hospital, they upgraded the charge to aggravated assault. Gibson was questioned later that afternoon at the police station after waiving his rights. A video of the interview was submitted into evidence at Gibson's trial.

¶8. Gibson said in the interview that he pulled up to the house and saw Rich and another female fighting at the garage door. Gibson got out of his vehicle and rushed toward them. A male was sitting in a gray Toyota Camry parked in Gibson's driveway. As Gibson rushed toward the women, the male got out of the Camry and came at Gibson. Gibson said he and the male fought. Gibson said the male hit him twice, and Gibson hit the male "three good times," knocking one of male's teeth out. Gibson said that is how he got the injury around his right knuckles.

¶9. Gibson said that after he and the male fought, he heard hollering inside the house and ran inside. At that time, the female ran out of the house, and she and the male drove off. Gibson found Rich lying on the floor inside, trying to get up. He said Rich was unresponsive, and there was blood all around her. Gibson got a wet towel and put it around Rich's neck and laid Rich on her side. Gibson then called the paramedics.

---

[2] A pseudonym is used to protect the minor child's identity.

3

¶10.   When investigators asked Gibson why Rich and the female were fighting, Gibson said he believed it was over sales commissions at the AT&T store where the two women had worked together. Gibson told the investigators that he had made Rich quit her job at the store a week earlier because Rich was not doing what she was supposed to be doing around the house, such as cleaning.

¶11.   The investigators then told Gibson that they had obtained video footage from a neighbor's door camera that showed the front of Gibson's house. They said the video did not show a gray Camry in the driveway at any point that day. They said, according to the video, Rich arrived at the house in her vehicle at 12:46 p.m. and went inside; Gibson arrived at the house shortly thereafter at 1:13 p.m. and went inside; and Gibson exited the house at 1:20 p.m., carrying something. They said the video showed Jessie Stringer arrive at the house and leave with Ben. They said the video also showed the ambulance leaving with Rich, driving off in one direction; and Gibson then drove off in another direction. The investigators asked Gibson why he did not tell them that Ben was in the house at the time of Rich's incident with the female. Gibson said he did not want Ben to talk to the police because it would traumatize him.

¶12.   Gibson then stopped talking to the investigators. The investigators informed Gibson that due to Rich's injuries, they were charging him with aggravated assault and that he was going to be detained. Following Rich's death, Gibson was charged with murder.[3]

¶13.   Ben was interviewed at a Child Advocacy Center (CAC) two days after Rich died.

_____

[3] Gibson was first tried in 2023, which resulted in a mistrial due to a hung jury. Gibson's second trial in 2024 is the subject of this appeal.

Ben told the interviewer that his dad was in jail because he hit his mom in the head with a broom, and she fell from the toilet and did a "funny." He said he did not see his dad hit his mom in the head with broom because his dad had told him to go to his room. Ben said he heard "cursing and screaming" from "Darcie and Billie." He said his mom and dad were in the kitchen "throwing stuff," and then they were in the bathroom. He said Gibson broke the broom by "hitting [Rich] in the head." Ben said it sounded loud, and he heard his mom say, "Oh, no!" Ben said Gibson then called the police "on himself" and then called Ben's Uncle Jessie to come pick him (Ben) up.

¶14. At trial, Ben testified that he saw Gibson pick up a broom and go to where Rich was in the house. Ben said that he did not see Gibson hit Rich with the broom, but he heard his dad "screaming." Ben said Gibson was "talking while he was screaming and mom was just screaming." Ben said his mom's screams sounded like "pain." Ben said afterwards, Gibson grabbed him and put him in Gibson's truck, and Uncle Jessie "came and got me."

¶15. Gibson testified at trial and admitted that he had lied to the police when he told them that other people had come to the house and assaulted Rich. Gibson said he was scared and embarrassed that he and Rich had gotten "into a fight and messed up Christmas for [the kids]." Gibson said that he and Rich "were having differences" because Rich "wasn't doing what she was supposed to be doing with the kids[,] getting Christmas presents," and Rich had "quit her job." Gibson told the jury that he had told Rich "he was fixing to leave her" and that she then "picked the barstool up and hit [him] in the face." Gibson said he did not know if he had pushed Rich in the face or hit her but "she fell." When he saw that "she wasn't

5

getting back up," he called the police and "that was there from there." Gibson said he carried Rich into the living room so Ben would not see her "laid out" on the floor. Gibson then called Stringer.

¶16. On cross-examination, when asked how the broom broke, Gibson said that he and Rich had gotten into an argument before he (Gibson) had gone to a Christmas party. During the argument, Gibson "got the broom, act[ed] like I was going to hit her with it, but actually she took it from me and hit me with it." Gibson testified that his hands were injured after Rich took the broom and hit him. Gibson said he tried to run to the bathroom and scraped his hand on the bathroom door frame.

¶17. When asked about the State's expert's testimony that Rich had suffered "multiple blunt-force trauma [sic]" to her head, Gibson acknowledged the expert's testimony. But Gibson maintained that Rich fell once and hit her head.

¶18. The jury found Gibson guilty of second-degree murder. Gibson appeals, claiming he was denied an excusable-homicide instruction defined by Mississippi Code Section 97-3-17 (Rev. 2014). Finding this issue dispositive, we address only this issue.

## DISCUSSION

¶19. Whether to grant or deny a proposed jury instruction lies within the trial court's sole discretion, which this Court reviews under an abuse-of-discretion standard. *Victory v. State*, 83 So. 3d 370, 373 (Miss. 2012) (citing *Newell v. State*, 49 So. 3d 66, 73 (Miss. 2010)). "No one instruction should be singled out[,]" and this Court will consider "the jury instructions as a whole to determine whether an error has occurred." *Id.* (citing *Newell*, 49 So. 3d at 73).

6

¶20. "A defendant is entitled to have jury instructions given which present his theory of the case[,]" but this is limited "in that the trial court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence." *Id.* (internal quotations marks omitted) (quoting *Newell*, 49 So. 3d at 74). "[I]f the instructions fairly announce the law of the case and create no injustice, no reversible error will be found." *Id.* (alteration in original) (internal quotation marks omitted) (quoting *Newell*, 49 So. 3d at 73).

¶21. Gibson claims the following testimony given by him at trial provided a factual basis for an excusable-homicide instruction:

> It was around Christmas time. You know, I guess, we was getting into the fight because she wasn't doing what she was supposed to be doing with the kids. She wasn't getting Christmas presents. I don't know, like I said, she said that she quit her job. I didn't know that. You know, what happened was, we got into an argument. We were in the kitchen. I told her I was fixing to leave her. She picked the barstool up and hit me in the face. I don't know if I pushed her in her face or hit her. But when I turned around, I seen that she wasn't getting back up, so I called the police and that was there from there.

¶22. Later during Gibson's direct examination, defense counsel asked, "So, exactly, what was the circumstances that [Rich] ended up on the ground?" Gibson responded, "Like I said, I don't know if I pushed her in the face or hit her, but she hit her head on the floor by the washing machine."

¶23. Gibson initially offered jury instruction D-6, which provided as follows:

> The Court instructs the jury that if you find that Darcie Rich died as a result of accident or misfortune while Billy Ray Gibson was engaged in a lawful act by lawful means, with usual and ordinary caution, and without unlawful intent, then you shall find the Defendant, Billy Ray Gibson, not guilty of First Degree Murder as charged in the indictment, Not Guilty of Second Degree Murder and

Not Guilty of Manslaughter and return your verdict as follows: "We, the Jury, find the Defendant, Billy Ray Gibson, not guilty, by reason of accident or misfortune."

¶24. The trial court found that instruction D-6, as written, was too abstract based on the facts in evidence. The trial court then gave defense counsel an opportunity to state the defense's legal theory of the case. Defense counsel responded as follows:

There was an altercation. She hit him. He pushed her. She fell. Hit her head. That's why she passed away. After reading intentional act, not through anything he did. It's not like he pushed her down, slammed her head to the floor or anything like that. She fell.

¶25. The trial court responded as follows:

You're entitled to an instruction that states the legal theory of your defense and D6 can be a starting point, but I'm going to take a recess for 15 minutes while you write an instruction. You can hand write it on a piece of paper, if necessary, for the theory of your defense; which was, apparently, that he did not intend the consequence. That it was a fight and that he pushed . . . her away when she hit him with a stool and that she fell and hit her head.

¶26. Defense counsel modified instruction D-6, which the trial court labeled as D-7. It provides:

The Court instructs the jury that if you find that Darcie Rich struck Billy Ray Gibson and Billy Ray Gibson pushed Darcie Rich in [sic] attempt to get away from her and in so doing[,] Darcie Rich fell and struck her head on the floor and subsequently died as the result of the accident or misfortune then you shall find the Defendant, Billy Ray Gibson, not guilty of First Degree Murder as charged in the indictment, Not Guilty of Second Degree Murder and Not Guilty of Manslaughter and return your verdict as follows: "We, the Jury, find the Defendant, Billy Ray Gibson, not guilty, by reason of accident or misfortune."

¶27. The State objected to D-7, arguing that Gibson did not say in his testimony that he was attempting to get away from Rich when Rich hit him in the face with the stool and that

8

Gibson did say he pushed her in the face or hit her.

¶28.   The trial court asked the State if Gibson is "entitled to use reasonable force to defend himself if he is struck?"  The State responded, "That is a self-defense instruction.  They didn't submit a self-defense instruction.  I think this is, like, an, excusable homicide; if I'm not mistaken.  But, this isn't a self-defense instruction."  The State further argued that D-7 seemed to be more of a heat-of-passion instruction.  The State added:

> The problem is, [D-7] says if you find that Darcie struck and he pushed, it presupposes that it's in the heat of passion as opposed to letting the Jury decide if those actions are actions of the heat of passion.  It should say something to the effect of, if you find that he did this and you find that it was in the heat of passion, those are actions; and then the description of what the passion is.  The facts given here, it just, presupposes that that counts and that's for the Jury to determine.

¶29.   Defense counsel responded that D-6 is the proper language for "an accident-and-misfortune instruction" and that is why he originally submitted D-6.  Defense counsel noted *Fox v. State*, 378 So. 3d 1007, 1030 (Miss. Ct. App. 2024), in which the Court of Appeals said that the same type of instruction proposed in that case was a correct statement of law and tracks the language of Mississippi Code Section 97-3-17(a) (Rev. 2014).

¶30.   Section 97-3-17 provides three scenarios in which a homicide may be excusable:

> The killing of any human being by the act, procurement, or omission of another shall be excusable:
>
> (a) When committed by accident and misfortune in doing any lawful act by lawful means, with usual and ordinary caution, and without any unlawful intent;
>
> (b) When committed by accident and misfortune, in the heat of passion, upon any sudden and sufficient provocation;

9

(c) When committed upon any sudden combat, without undue advantage being taken, and without any dangerous weapon being used, and not done in a cruel or unusual manner.

Miss. Code Ann. § 97-3-17 (Rev. 2014).

¶31. This Court has repeatedly held that "[i]n homicide cases, the trial court should instruct the jury about a defendant's theories of defense, justification, or excuse that are supported by the evidence, no matter how meager or unlikely." *Nelson v. State*, 284 So. 3d 711, 718 (Miss. 2019) (alteration in original) (internal quotation marks omitted) (quoting *Brown v. State*, 39 So. 3d 890, 899 (Miss. 2010)). Further, this Court has held that

> when the judge is confronted with what the judge perceives to be an improperly worded jury instruction attempting to set out a point of law on which the jury should be instructed, and which is not covered elsewhere in other jury instructions already given, the judge should take whatever remedial action necessary to present a properly worded instruction to the jury on that point of law.

*Brown*, 39 So. 3d at 900 (citing *Davis v. State*, 18 So. 3d 842, 847 (Miss. 2009)).

¶32. Here, the trial court agreed with the defense that some sort of excusable-homicide instruction should be given, finding D-6 to be a "good starting point." The defense came back with D-7, which the State argued was incorrect because Gibson did not testify that he was attempting to get away from Rich. We find, however, that the jury could possibly infer that is what happened based on Gibson's testimony.

¶33. Because there was a foundation in the evidence for excusable homicide, Gibson was entitled to have a jury instruction given that provided for this defense. Neither proposed jury instruction D-6 or D-7 was an incorrect statement of law for purposes of Section 97-3-17, and no other instruction was given that covered this defense. Accordingly, the denial of an

excusable-homicide instruction was reversible error.

¶34.    The dissent contends that because Gibson stated he either pushed or hit Rich in the face, this was an intentional act and not an accident.  And because it was an intentional act, it "cannot fit the doctrine of accident or misfortune" for purposes of excusable homicide.  Diss. Op. ¶ 79 (internal quotation mark omitted) (quoting *Montana v. State*, 822 So. 2d 954, 962 (Miss. 2002)).  The dissent further contends that since Gibson did not testify that he perceived and feared an imminent or actual threat from Rich, he cannot maintain that Rich's death was excusable under Section 97-3-17(a).  Lastly, the dissent submits that Gibson gave no rebuttal testimony to the State's expert that Rich suffered multiple blunt-force traumas to her head that resulted in her death.

¶35.    We address each, beginning with the dissent's contention that Gibson gave no rebuttal testimony to the State's expert witness.  The State presented the same argument to the trial court when the State objected to Gibson's proposed excusable-homicide instructions, saying it would suggest that Rich only suffered one trauma.  The trial court rejected this argument and correctly told the State, "[t]hat would be for the Jury's determination."

¶36.    Nowhere in the expert's testimony did the expert exclude the possibility that Rich's death resulted from her head hitting the floor.  That Gibson acknowledged the expert's testimony while maintaining that Rich fell once presented a question for the jury as to both the State's evidence and the defense's evidence.

¶37.    We do not—as the dissent would have us—either weigh the evidence or view the evidence in a light most favorable to the State's case or the jury's verdict when reviewing on

11

appeal whether a foundation existed in the evidence that would have supported the defendant's defense theory. *Nelson*, 284 So. 3d at 718.

¶38. As to the dissent's contention that Gibson was not entitled to an excusable-homicide instruction because Gibson admitted that he intentionally pushed or hit Rich, this Court's decision in *Jeffcoat v. State*, 21 So. 2d 8 (Miss. 1945), directly contradicts it. *Jeffcoat* and the cases it relied upon, all of which are based on circumstances similar to this case, dispel the blanket notion that an intentional act cannot fit the doctrine of accident or misfortune for purposes of our excusable-homicide statute.

¶39. The dissent argues that *Jeffcoat* is distinguishable because "the defendant argued under subsection (c) of a prior version of the excusable homicide statute[,]" whereas "Gibson *only* argues under subsection (a)[.]" Diss. Op. ¶ 81 (citing *Jeffcoat*, 21 So. 2d at 9). We find this to be of no moment to our analysis of the issue before us.

¶40. First, although Gibson's counsel submitted instructions sounding in subsection (a), defense counsel actually argued under subsection (c) of the statute during the jury-instruction conference. When the trial court asked defense counsel to state the legal theory of Gibson's defense, defense counsel responded, "There was an altercation. She hit him. He pushed her. She fell. Hit her head. That's why she passed away." That theory falls under subsection (c), which provides for excusable homicide "[w]hen committed upon any sudden combat, without undue advantage being taken, and without any dangerous weapon being used, and not done in a cruel or unusual manner." Miss. Code Ann. § 97-3-17(c).

¶41. Second and moreover, when considering the applicability of the excusable-homicide

12

statute, both this Court and the Court of Appeals have not hesitated to reverse a conviction on direct appeal when either the state or defense counsel submitted the wrong subsection or failed to provide the jury all of the elements under the statute when warranted. *See Triplett*, 666 So. 2d at 1362 (reversing conviction on direct appeal based on ineffective assistance of counsel that included failure to request a proper excusable-homicide instruction); *Miller v. State*, 677 So. 2d 726, 732 (Miss. 1996) (reversing murder conviction when defendant was denied an excusable-homicide instruction while noting that the denied instruction "could have been better written by setting out all three subsections" and adding that "the point remains that [the defendant] was entitled to an accident instruction"); *McTiller v. State*, 113 So. 3d 1284 (Miss. Ct. App. 2013) (reversing conviction on direct appeal based on ineffective assistance of counsel for failing to object to an excusable-homicide instruction granted to the state that lacked all the elements contained Section 97-3-17); *see also Scott v. State*, 446 So. 2d 580, 583 (Miss. 1984) (reversing when excusable-homicide instruction granted to the State completely failed to mention accident, misfortune, the heat of passion, or any sudden and sufficient provocation); *Brown*, 39 So. 3d at 900 (finding reversible error in trial court's refusal to grant excusable-homicide instruction when evidentiary basis supported it); *Clayton v. State*, 106 So. 3d 802, 806 (Miss. 2012) (same).

¶42. The dissent also argues that *Jeffcoat* and the cases it relied upon are distinguishable because those cases presented evidence for either "heat of passion" or "sudden combat" excusable homicide. Diss. Op. ¶¶ 81-82. While making no mention of Gibson's testimony that Rich "picked the barstool up and hit me in the face," the dissent submits that Gibson

presented no such evidence.

¶43. Were this Court to establish that getting hit in the face with a barstool does not constitute a question for the jury as to either *sudden and sufficient provocation* or *sudden combat* "would be, as to any practicable use, to take the statute out of the books, regardless of the relative sizes of the parties, for there would be left scarcely any imaginable case to which the statute would apply." *Jeffcoat*, 21 So. 2d at 10. Whether this occurred, as Gibson claimed, was a matter for the jury's consideration, along with an adequate instruction on what the law provides.

¶44. The State made the same argument to the trial court during the jury-instruction conference that the dissent advances here. The State told the trial court essentially that Gibson's claim of what happened was not a consideration for the jury because Gibson did not submit a self-defense instruction.

¶45. As mentioned, when the trial court inquired whether Gibson was entitled to use reasonable force to defend himself when Rich allegedly struck Gibson in the face with a barstool, the State replied that this would require a self-defense instruction. The State argued that Gibson was not entitled to such an instruction because "there's been no evidence of self defense." The State then conflated excusable homicide with justifiable homicide, telling the trial court that Gibson "never stated that he was in fear for his life or serious bodily harm."

¶46. Gibson's theory of the case was excusable homicide, not self-defense under Mississippi Code Section 97-3-15 (Supp. 2019), which provides for justifiable homicide. That section justifies the *intentional killing* of another under circumstances that would lead

14

a reasonable person to conclude that he or she "was in imminent danger of death or great bodily harm." *Wells v. State*, 233 So. 3d 279, 285 (Miss. 2017) (internal quotation mark omitted) (quoting *Lentz v. State*, 604 So. 2d 243, 246 (Miss. 1992)). Gibson gave no such testimony, and he requested no jury instruction to that effect. *See Taylor v. State*, 597 So. 2d 192, 194 (Miss. 1992) (placing nonissue of justifiable homicide before the jury when no evidence of self-defense was offered, and the defendant's theory of defense was excusable homicide "resulted in the substantial risk that the jury misapprehended the law in the course of its deliberations").

¶47.    Yet self-defense as contemplated by the justifiable-homicide statute is what the State argued to the trial court in support of its objections to each of Gibson's proposed excusable-homicide instructions. The State further told the trial court that an "intentional act could *never* be the basis for an accident instruction." (Emphasis added.) This is a misconception of our excusable-homicide statute.

¶48.    Unquestionably, the vast majority of homicide cases reviewed by this Court dealing with the excusable-homicide statute involve the use of a firearm or other deadly weapon. And it was believed at one point in the past that a defendant was not entitled to an excusable-homicide instruction "in any case where death resulted from the use of a deadly weapon." *Wood v. State*, 64 Miss. 761, 2 So. 247, 249 (1887) (citing Miss. Code (1880) § 2879). This interpretation of the statute changed over the years as this Court garnered a better understanding of its scope. *See Miller*, 677 So. 2d at 730 ("While these cases seem to say that a homicide can never be excusable when a gun, or other dangerous weapon, is used, that

15

is not the law."); *see also* Michael H. Hoffheimer, *Murder and Manslaughter in Mississippi: Unintentional Killings*, 71 Miss. L.J. 35, 97 (2001) (noting much confusion with application of the excusable-homicide statute based on this Court's different interpretations of the statute).

¶49.    *Montana* involved the use of a firearm.  There, the defendant had admitted he intentionally fired his weapon, but he claimed he did not intend to shoot the victim. *Montana*, 822 So. 2d at 962.  The defendant unsuccessfully sought a jury instruction under Section 97-3-17(b), instructing the jury to find him not guilty if the jury concluded that, "in the heat of passion, upon any sudden and sufficient provocation[,]" the defendant "fired the pistol in the air and that one of the rounds . . . accidentally and/or through misfortune killed" the decedent.  *Id.* at 961 (internal quotation mark omitted).

¶50.    Affirming the trial court's refusal of the instruction, the *Montana* Court said, "No evidence was presented that any of the shots fired by Montana were accidentally fired, but only that the direction of the bullet was accidental."  *Id.*  Citing another case involving a firearm, the *Montana* Court said that

> *An intentional act cannot fit the doctrine of accident or misfortune.  See* ***Triplett v. State***, 666 So. 2d 1356, 1362 (Miss. 1995) (defendant was entitled to accident or misfortune instruction only where evidence showed there was no intent on his part to fire the fatal shot).

*Montana*, 822 So. 2d at 962 (emphasis added).

¶51.    *Triplett* similarly involved a shooting death in which the defendant admitted firing his weapon into the air.  *Triplett*, 666 So. 2d at 1358.  But unlike in *Montana*, the *Triplett* Court found evidence was presented that the fatal shot may have resulted from someone

16

unexpectedly grabbing the defendant from behind and tussling with him, causing the defendant to unintentionally fire the second shot. *Id.* The *Triplett* Court noted that an excusable-homicide instruction was granted in the case, and the Court made the following comment in relation to it: if "there was no intent on his part to fire the weapon [sic] the second shot, then he was not guilty of either murder or manslaughter." *Id.* at 1362.

¶52. From this comment by the *Triplett* Court speaking to the evidence in the case before it, the *Montana* Court paraphrased that "[a]n intentional act cannot fit the doctrine of accident or misfortune." *Montana*, 822 So. 2d at 962 (citing *Triplett*, 666 So. 2d at 1362). Nowhere in *Triplett*, did this Court say that "an intentional act cannot fit the doctrine of accident or misfortune," or even use the phrase "doctrine of accident or misfortune."

¶53. This was a misstatement (or overstatement) by the *Montana* Court, which was discussing the intentional use of a deadly weapon. And under the particular facts of that case, Section 97-3-17 was precluded from consideration.

¶54. In *Jeffcoat*, however, this Court addressed a case that did not involve the intentional use of a deadly weapon but did involve an intentional act. There, the defendant was tried for the murder of his wife and was convicted of manslaughter. *Jeffcoat*, 21 So. 2d at 9. This Court reversed for a new trial based on the weight of the evidence. *Id.*

¶55. The evidence in *Jeffcoat* showed that the husband and wife had gotten into a heated argument over eight dollars left over from a twenty-dollar loan the husband had received for farm purposes. *Id.* As the husband was lying in bed, the wife began searching for the money. The wife "finally came to the bed, on which the husband was lying, to make a search

17

there. She grasped her husband by the hair, evidently in the effort to pull him from the bed, whereupon the husband struck her with his fist, causing her to fall. She did not arise." *Id.* The physician who was called to the house afterwards testified at trial that the wife died from a broken neck. *Id.*

¶56. The husband sought a peremptory instruction of not guilty based on the excusable-homicide statute, which the trial court denied. *Id.* On appeal, this Court was divided on whether a peremptory instruction should have been granted. Ultimately, a majority of the Court found that it was a matter for the jury on the question of manslaughter, and whether the husband had used excessive force in a cruel or unusual manner. *Id.* at 10.

¶57. Speaking to the excusable-homicide statute, the Court first noted that,

> Although this statute has been in all our Codes since early days, only a few cases have been reported under it, and these are to the effect that i[t] is not available to an aggressor, and to the same effect are the decisions in other states which have a similar statute. We have found only two cases which seem to be in point with the case now before us. They are *Mead v. State*, 65 Okl.Cr. 86, 83 P.2d 404, and *State v. Coff*, 267 Mo. 14, 183 S.W. 287, and they tend to sustain appellant's contention.

*Jeffcoat*, 21 So. 2d. at 9-10.

¶58. The Court then explained:

> The majority [of this Court] is of the opinion that to hold that appellant used excessive force and acted in a cruel and unusual manner would be to assume that the blow broke the neck, whereas the testimony is undisputed that the wife fell with her head 'lying right beside the tru[n]k.' In the numerous cases which we have examined on this subject we have observed that in nearly all of them the fall and not the blow caused the death. . . . **Moreover, even if it were established that the blow caused it, then to say that because death resulted it was cruel and unusual, would be, as to any practicable use, to take the statute out of the books, regardless of the relative sizes of the parties, for there would be left scarcely any imaginable case to which the statute**

18

**would apply.**

*Id.* at 10 (emphasis added).

¶59. Finally, the Court cautioned:

> A man who strikes a woman stands in no favorable light before a jury or before a court; whence there is the admonition that the review of a record, involving such a case, should be done with particular pains that it is done dispassionately and in the full light of the requirement of the law that every essential fact must be proved, not by inferences which lead to no more than probabilities, but to a moral certainty, beyond all reasonable doubt.

*Id.*

¶60. The *Jeffcoat* Court construed subsection (c) of the excusable-homicide statute, which contemplates a homicide resulting from mutual combat and does not contain the phrase "accident and misfortune" as found in subsections (a) and (b). That the Court referenced only subsection (c) is because the defendant had only argued that provision to the trial court in his request for a peremptory charge. Still, in its analysis of the case, the *Jeffcoat* Court cited with approval two cases from other jurisdictions with excusable-homicide statutes the same as ours, *Mead v. State*, 83 P.2d 404 (Okla. 1938), and *State v. Coff*, 183 S.W. 287 (Mo. 1916).

¶61. In the *Mead* case, the defendant was convicted of manslaughter based on evidence that the defendant "struck or pushed" the decedent with his hand after the decedent came up to the defendant and pointed his "hand at the defendant's face and said something." *Mead*, 83 P.2d at 406. As a result of the defendant's action, the decedent stumbled and fell into a ditch and died in the hospital eleven days later. *Id.* at 407.

¶62. The *Mead* court found there was insufficient evidence to the support the manslaughter

19

conviction. The *Mead* court concluded:

> It will be observed that the evidence, both on behalf of the State and that of the defendant, shows that the defendant was at a place where he had a right to be; that the deceased was the aggressor, used abusive language, and made an assault upon the defendant, and the testimony of all the witnesses shows, or tend to show, **that the alleged homicide was committed by accident and misfortune, in the heat of passion, upon sudden provocation, and that no undue advantage was taken, nor any dangerous weapon used, and without any unlawful intent.** The testimony on the part of the defendant was that the blow struck by the defendant was for the purpose of preventing the deceased continuing in his assault upon the defendant.

*Id.* at 410 (emphasis added).

¶63.    In the *Coff* case, the defendant was charged with murder and convicted of manslaughter. *Coff*, 183 S.W. 287. The prosecutions's evidence was that the defendant and the decedent's son were fighting, and the decedent attempted to break up the fight. *Id.* at 288. The defendant struck the decedent who fell to his knees. When the decedent tried to stand up, the defendant hit him again, which knocked the decedent down, "and, as he fell, his head struck the curbstone." *Id.* The defendant allegedly then kicked the decedent several times, and the decedent rolled into the gutter unconscious. *Id.*

¶64.    The defendant, however, testified that the decedent had rushed him with a broom and tried to strike him with it, but the broom slipped from the decedent's hand. *Id.* The decedent then grabbed the defendant by the throat, and the defendant shoved the decedent who "staggered out into the gutter and fell." *Id.*

¶65.    The Missouri Supreme Court held that the trial court erred by failing to instruct the jury "on the theory of an accidental homicide." *Id.* at 289. The Court said:

> It will be noted that the evidence of defendant **tends to show that his**

20

**participation in the combat was merely that of a person defending himself, and that he was therefore engaged in a lawful act**; that while in the act of defending himself, the deceased grabbed him by the throat, and, in order to protect himself, he shoved deceased away, causing him to stagger and fall. In the fall deceased's head struck the curb and received the fatal wound. **If, therefore, defendant's evidence be true, the death occurred by accident or misfortune "upon a sudden combat without any undue advantage being taken and without any dangerous weapon being used, and [the killing] was not done in a cruel and unusual manner**."

*Id.* (alteration in original) (emphasis added).

¶66. As *Jeffcoat* and the two cases it cites illustrate, the law of excusable homicide contemplates intentional acts. In each of these cases, the defendant intentionally struck the decedent.

¶67. The Court concluded in *Jeffcoat* that whether the death that resulted was from "sudden combat, without undue advantage being taken, and without any dangerous weapon being used, and not done in a cruel or unusual manner," was a question for the jury. *Jeffcoat*, 21 So. 2d at 9-10. In *Mead*, because the evidence undisputedly showed that death resulted by accident and misfortune, in the heat of passion, upon sudden provocation, with no undue advantage taken, no dangerous weapon used, and no unlawful intent, the reviewing court held that the homicide was excusable as a matter of law. *Mead*, 83 P.2d at 410. And in *Coff*, the evidence was conflicting as to whether the defendant's participation in the combat was that of a person defending himself and engaged in a lawful act. *Coff*, 183 S.W. at 289. But it was a question for the jury, nonetheless, whether the "death occurred by accident or misfortune 'upon a sudden combat without any undue advantage being taken and without any dangerous weapon being used, and [the killing] was not done in a cruel and

21

unusual manner.'" *Id.* (alteration in original).

¶68.    We find the same here.  The State presented evidence that Gibson and Rich were arguing with each other on Christmas Eve.  Their son Ben saw Gibson pick up a metal broom and go to where Rich was in the house.  Ben did not see Gibson hit Rich with the broom, but he heard his mother scream, which sounded to Ben like pain.

¶69.    Gibson denied hitting Rich with the broom.  He testified that Rich was the initial aggressor who assaulted him by hitting him in the face with a barstool after he told her that he was going to leave her.  In response, Gibson either pushed Rich in the face or hit her. Rich then fell and hit her head on the floor.

¶70.    On the State's evidence, the jury was instructed on the elements of deliberate-design murder, depraved-heart murder, and culpable-negligence manslaughter.  And through jury instruction S-9, the jury was informed that deliberate design "means intent to kill without authority of law, and not being legally justifiable, or legally excusable."

¶71.    On the defense's evidence, Gibson was denied a jury instruction on what *legally excusable* means.  Consistent with this Court's decision in ***Jeffcoat***, Gibson was entitled to such an instruction.

¶72.    While we maintain that our trial judges do not have the duty to instruct the jury *sua sponte* or the responsibility to suggest instructions in addition to those tendered by the parties, the trial court initially recognized that Gibson should have been granted an excusable-homicide instruction.  But confusion with regard to the applicability of the excusable-homicide statute then ensued, which resulted in the jury not being instructed "on

22

correct principles of law" given the evidence presented in this case. *Scott*, 446 So. 2d at 583

(citing **Pittman v. State**, 297 So. 2d 888 (Miss. 1974)). Accordingly, we must reverse

Gibson's conviction and remand the case for further proceedings consistent with this opinion.

## CONCLUSION

¶73. Finding that Gibson was entitled to an excusable-homicide jury instruction under

Section 97-3-17, we reverse Gibson's conviction and sentence, and we remand the case to

the Hinds County Circuit Court for further proceedings consistent with this opinion.

¶74. **REVERSED AND REMANDED.**

**KING AND COLEMAN, P.JJ., AND ISHEE, J., CONCUR. RANDOLPH, C.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY GRIFFIS AND BRANNING, JJ.**

**RANDOLPH, CHIEF JUSTICE, DISSENTING:**

¶75. Mississippi recognizes three scenarios as excusable homicide:

> The killing of any human being by the act, procurement, or omission of another shall be excusable:
>
> (a) When committed by *accident and misfortune* in doing any *lawful act by lawful means*, with usual and ordinary caution, and *without any unlawful intent*;
>
> (b) When committed by, accident and misfortune in the heat of passion, upon any sudden and sufficient provocation;
>
> (c) When committed upon any sudden combat, without undue advantage being taken, and without any dangerous weapon being used, and not done in a cruel or unusual manner.

Miss. Code Ann. § 97-3-17 (Rev. 2014) (emphasis added).

¶76. Gibson proposed two jury instructions—D-6 and then, D-7—which he argues should

23

have been granted as an excusable-homicide instruction because that was his theory of defense. This Court has stated that "[a] defendant is entitled to have jury instructions given which present his theory of the case; however, this entitlement is limited in that the court may refuse an instruction which incorrectly states the law, is fairly covered elsewhere in the instructions, or is without foundation in the evidence." *Victory v. State*, 83 So. 3d 370, 373 (Miss. 2012) (internal quotation marks omitted) (quoting *Newell v. State*, 49 So. 3d 66, 73 (Miss. 2010)). Gibson lacked a foundation in evidence for an excusable-homicide instruction and failed to offer an instruction that adequately apprised the jury of the law based on the facts presented to the jury in this case. Thus, I respectfully dissent.

¶77.    The first instruction, D-6, stated:

> The Court instructs the jury that if you find that Darcie Rich died as the result of accident or misfortune while Billy Ray Gibson was engaged in a lawful act by lawful means, with usual and ordinary caution, and without unlawful intent, then you shall find the Defendant, Billy Ray Gibson, not guilty of First Degree Murder as charged in the indictment, Not Guilty of Second Degree Murder and Not Guilty of Manslaughter and return your verdict as follows: "We, the Jury, find the Defendant, Billy Ray Gibson, not guilty, by reason of accident or misfortune."

The second instruction, D-7, stated:

> The court instructs the jury that if you find that Darcie Rich struck Billy Ray Gibson and Billy Ray Gibson pushed Darcie Rich in [an] attempt to get away from her and in so doing Darcie Rich fell and struck her head on the floor and subsequently died as the result of the accident or misfortune then you shall find the Defendant, Billy Ray Gibson, not guilty of First Degree Murder as charged in the indictment, Not Guilty of Second Degree Murder and Not Guilty of Manslaughter and return your verdict as follows: "We, the Jury, find the Defendant, Billy Ray Gibson, not guilty, by reason of accident or misfortune."

Both instructions were refused by the trial court. Initially, with regard to D-6, the trial court

24

held that the instruction was too abstract in its statement of the law and refused the instruction as offered. The court then gave Gibson the opportunity to revise the instruction to actually fit the facts and correctly state the law. Gibson returned with D-7, which was similarly refused by the court.

¶78.    Despite multiple stories by Gibson as well as uncontested testimony, including medical evidence, all of which undermine accident and misfortune, Gibson offered no evidence to support accident and misfortune. Not one person offered testimony that Rich's death was an accident. Gibson testified, "I don't know if I pushed her in her face or hit her. But when I turned around, I seen that she wasn't getting back up, so I called the police and that was there from there." When asked exactly how Rich ended up on the ground, Gibson clarified, "I don't know if I pushed her in the face or hit her, but she hit her head on the floor by the washing machine." Nothing in Gibson's testimony suggests that he *accidentally* pushed or struck Rich. He unequivocally stated that he either pushed her in the face or hit her. That was no accident.

¶79.    Generally, "[a]n intentional act cannot fit the doctrine of accident or misfortune." ***Montana v. State***, 822 So. 2d 954, 962 (Miss. 2002) (citing ***Triplett v. State***, 666 So. 2d 1356, 1362 (Miss. 1995)). In ***Montana***, the defendant testified that although he intentionally fired his weapon into the air, he "did not intentionally try to shoot or aim at somebody." ***Id.*** (internal quotation mark omitted). Nevertheless, the defendant's shots that he fired into the air killed Rashad Holloway. ***Id.*** at 957. This Court held that the trial court properly denied the defendant's accident or misfortune jury instructions because "all evidence demonstrated

25

that each shot fired by Montana was intentionally fired." *Id.* at 962.

¶80.   The majority opines that *Montana* was a misstatement of the law and relies on two Mississippi cases with dissimilar facts and two out-of-state decisions that utilized intentional acts as the basis of distinctly different sections of an excusable-homicide theory of defense—*Jeffcoat v. State*, 21 So. 2d 8 (Miss. 1945); *Fox v. State*, 378 So. 3d 1007 (Miss. Ct. App. 2024),[4] *Mead v. State*, 83 P.2d 404 (Okla. 1938); and *State v. Coff*, 183 S.W. 287 (Mo. 1916). As all are clearly distinguishable, reliance on such cases is misplaced.

¶81.   In *Jeffcoat*, the defendant argued under subsection (c) of a prior version of the excusable-homicide statute. *Jeffcoat*, 21 So. 2d at 9. Gibson *only* argues under subsection (a), however. Likewise, the defendant in *Mead* argued under subsection two of Oklahoma's excusable-homicide statute (heat of passion), which contained similar language to subsection (b) regarding heat of passion in our statute.[5] *Mead*, 83 P.2d at 409. Gibson's argument is based on neither of the aforementioned subsections. Gibson only argued under the accident-and-misfortune subsection of our statute. Gibson did not present facts supporting or argue a heat-of-passion theory; thus, reliance on *Mead* is clearly misplaced.

---

[4] The majority opines that *Fox* supports Gibson's position. D-6 stated the law in the abstract, but in that case, the excusable-homicide defense had a foundation in evidence. *Fox*, 378 So. 3d at 1030-32. Here, Gibson's claim of excusable homicide has no foundation in evidence since he intentionally acted.

[5] Subsection two of the Oklahoma excusable-homicide statute provides for excusable homicide "[w]hen committed by accident and misfortune in the heat of passion, upon any sudden and sufficient provocation, or upon a sudden combat provided that no undue advantage is taken, nor any dangerous weapon used, and that the killing is not done in a cruel or unusual manner." *Mead*, 83 P.2d at 409 (internal quotation mark omitted) (quoting Okla. Stat. Ann. tit. 21, § 731).

¶82.　The 1916 version of the Missouri excusable-homicide statute at issue in *Coff* again used the similar language.[6] However, the defendant in that case argued under the "upon sudden combat" language of the statute. *Coff*, 183 S.W. at 289. Gibson did not argue or present evidence of sudden combat. Under that subsection of our statute, reliance on *Coff* is misplaced as well.

¶83.　*Montana* remains the law of Mississippi. The *Montana* Court reached the conclusion that, generally speaking, intentional acts do not fit easily into the doctrine of accident or misfortune. *Montana*, 822 So. 2d at 962. Acting in an unlawful manner toward another human being, whether aiming a gun at a person or hitting or pushing a person, without evidence that the act was lawful, will not result in the allowance of an accident-or-misfortune jury instruction. In the present case, Gibson offered no evidence that his intentional act—pushing or hitting Rich in the face—resulted in an excusable homicide as defined by Section 97-3-17(a). Under this subsection and the facts as found in today's record, the issue that arises is whether his testimony would support an instruction for excusable homicide.

---

[6] The version of the Missouri excusable-homicide statute in effect at the time stated the requirements for excusable homicide:

> Homicide shall be deemed excusable when committed by accident or misfortune, in either of the following cases: First, in lawfully correcting a child, apprentice or servant, or in doing any other lawful act by lawful means, with usual and ordinary caution, and without unlawful intent; or, second, in heat of passion, upon any sudden or sufficient provocation, or upon sudden combat, without any undue advantage being taken, and without any dangerous weapon being used, and not done in a cruel and unusual manner.

*Coff*, 183 S.W. at 289 (internal quotation marks omitted) (quoting Mo. Rev. Stat. § 4452 (1909)).

27

¶84. To reiterate, Section 97-3-17(a) states that "[t]he killing of a human being by the act, procurement, or omission of another shall be excusable . . . when committed by the accident and misfortune in doing any lawful act by lawful means, with usual and ordinary caution, and without any unlawful intent." Both in the trial court and here, Gibson has relied on subsection (a) for his argument that he was entitled to an accident-or-misfortune jury instruction. However, he offered no evidence to support such an instruction. The majority argues that Gibson's testimony could have fit any of the subsections contained in Section 97-3-17. Respectfully, Gibson did not submit an instruction under the other subsections based on the evidence that might fit this statute anyhow. The D-6 instruction quoted subsection (a) and was vague and abstract as pointed out by the trial judge: "The Court instructs the jury that if you find that Darcie Rich died as the result of accident or misfortune while Billy Ray Gibson was engaged in a lawful act by lawful means, with usual and ordinary caution, and without unlawful intent . . . ." His second attempt at curing the fatal D-6 instruction added facts not introduced in evidence; thus, the D-7 instruction was fatal as well. Gibson never offered a jury instruction that was supported by evidence under any other theory of excusable homicide. This Court "will not act as an advocate for one party to an appeal." *Rosenfelt v. Miss. Dev. Auth.*, 262 So. 3d 511, 519 (Miss. 2018) (internal quotation marks omitted) (quoting *Jefferson v. State*, 138 So. 3d 263, 265 (Miss. Ct. App. 2014)).

¶85. Gibson testified that he and Rich were arguing and that the argument escalated: "I don't know if I pushed her in the face or hit her. But when I turned around I seen that she wasn't getting back up, so I called the police and that was there from there." Gibson offered

no testimony to rebut the evidence that Rich suffered *multiple* blunt-force traumas to her head, which resulted in her death. Gibson maintained that Rich hit her head once on the floor. Critically, Gibson did not testify that he perceived and feared an imminent or actual threat from Rich and acted reasonably to defend himself. Without any evidence to support that Gibson was lawfully acting to defend himself, he cannot seek to maintain that Rich's death was excusable homicide under Section 97-3-17(a). Furthermore, his proposed accident-and-misfortune jury instructions were insufficient; the first was vague and unhelpful to the jury, and the second misstated the facts.

¶86.    While an intentional act may form the basis of an accident-and-misfortune theory of defense, Gibson failed to offer evidence in this case that he was acting lawfully when he intentionally hit or pushed Rich. Additionally, he failed to offer an accident-and-misfortune jury instruction that correctly instructed the jury on the law and the facts of the case. For these reasons, I respectfully dissent.

**GRIFFIS AND BRANNING, JJ., JOIN THIS OPINION.**